SEITZ (Elizabeth), Plaintiff and Appellant, v. SEITZ (Frederick) and another, Defendants: SMIDL and another, Defendants and Respondents.

*May 9—June 6, 1967.*

284

286

For the appellant there were briefs by *Habush, Gillick, Habush & Davis* of Milwaukee, and oral argument by *Robert L. Habush.*

For the respondents there was a brief by *Kluwin, Dunphy, Hankin & Hayes* of Milwaukee, and oral argument by *Bernard J. Hankin.*

CURRIE, C. J.    Plaintiff seeks a new trial on the following grounds:

(1)    The apportionment of negligence is contrary to the evidence.

(2)    The trial court permitted improper cross-examination of plaintiff's husband.

(3)    The trial court abused its discretion in permitting defendants to amend their answer during the course of trial.

(4)    The trial court erroneously excluded certain medical bills.

(5)    The trial court committed error in instructing the jury.

(6)  The damages awarded are so inadequate as to indicate passion and prejudice on the part of the jury.

(7)  The bailiff wrongfully communicated with the jury.

(8)  In the interest of justice.

### *Apportionment of Negligence.*

The issue raised regarding the jury's equal apportionment of negligence between Seitz and Smidl necessitates a review of the evidence leading up to the near-collision which caused plaintiff's injuries.

The incident occurred about 11 p. m., April 6, 1962, at the intersection of North Sixtieth street and West Appleton avenue in the city of Milwaukee. North Sixtieth street runs in a northerly and southerly direction while West Appleton avenue runs in a northwesterly and southeasterly direction. Both streets carry four lanes of traffic, two in each direction. The Seitz car driven by Mr. Seitz, in which plaintiff was a passenger, was proceeding in a northwesterly direction on West Appleton avenue. The Smidl car was at the same time proceeding northerly on North Sixtieth street. Smidl was also accompanied by his wife as a passenger.

The traffic control signals which governed the intersection at the time of the near-collision controlled traffic on North Sixtieth street by means of a flashing red light and traffic on West Appleton avenue by means of a flashing yellow light. Smidl brought his car to a stop in obeyance of the flashing red light. He then proceeded across the intersection which, because of the wide angle at which the two streets intersect, measures 117 feet from the curb line at the southeast corner to the curb line at the northeast corner.

Seitz who was approaching the intersection in the lane nearest the curb brought his car to a sudden stop by forcibly applying his brakes to avoid striking the Smidl car. As a result of the sudden application of the

brakes, plaintiff was thrown against the windshield and injured. The windshield, however, was not broken as a result of the impact. There was no collision between the two vehicles. When the Seitz car came to a stop the front of the Smidl car was beyond the north curb line of the intersection with no more than the rear five feet of it within the intersection.

The testimony is conflicting with respect to the distance that separated the cars when Seitz brought his car to a stop. The distance was estimated by Seitz to be three to five feet, by Mrs. Smidl to be 10 to 12 feet, and by Smidl to be 25 feet. Smidl estimated his speed as he crossed the intersection at 20 to 25 miles per hour, while Seitz testified his speed was 25 to 30 miles per hour. The speed limit on West Appleton avenue was 30 miles per hour.

The testimony with respect to the lookout exercised by both drivers is a crucial factor in passing on the apportionment of negligence. While there are some variations in the testimony of both Smidl and Seitz with respect to lookout, we need consider only the testimony which tends to support the verdict.[1] Smidl testified that he looked both directions after bringing his car to a stop before entering the intersection and that he observed the headlights of a car approaching from the southeast about two to two and a half blocks away. Mrs. Smidl estimated the headlights to be a block and a half to two blocks away. Neither Mrs. Smidl nor her husband testified they looked to the right, or southeast, after their initial observation when they stopped for the flashing light, until they heard the screeching of the brakes of the Seitz car.

---

[1] In passing on an issue of whether the evidence supports the jury's verdict it is only necessary for the court to consider such testimony as tends to sustain the verdict. *Sturm v. Simpson's Garment Co.* (1956), 271 Wis. 587, 590, 74 N. W. (2d) 137; *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 109, 62 N. W. (2d) 549, 63 N. W. (2d) 740.

Seitz testified that when he was a half block or 200 feet from the intersection he saw the Smidl car approach and stop for the flashing signal. He testified further that he thereafter observed a Chevrolet automobile approaching from the north on North Sixtieth street which made a wide sweeping left turn onto West Appleton avenue, and that the left-turning car obscured his vision of the Smidl car. Plaintiff corroborated her husband's testimony with respect to the presence of the left-turning vehicle. Smidl on the other hand testified that he saw no car approaching on North Sixtieth street at the time he stopped and before he proceeded into the intersection. We consider particularly significant the following portion of Seitz's testimony on adverse examination prior to trial:

"Q. Were you at least 200 feet from the Smidl car when you first saw it? A. Yes.

"Q. And where was the Smidl car at that time? A. He approached the intersection and stopped.

"Q. Now, did you continue to watch the Smidl car? A. Not when this—when this car turned, that Chevrolet, then I didn't watch him any more.

"Q. Because the Chevrolet blocked your view, didn't it? A. Yes. And I expected him to yield the right of way to me.

"Q. I see. So the next time that you saw the Smidl car would be when? A. When it was right broadside in front of me when this Chevrolet had turned.

"Q. Well, now are you saying that you saw the car, the Smidl car for the first time when you were about half a block away? A. Yes.

"Q. And are you saying that the next time that you saw it was when it was right in front of you? A. Yes."

The aforequoted portion of Seitz's adverse examination was read to him upon cross-examination. Seitz testified that the answers given were true. Thus neither driver saw the car of the other after making their initial observations before Smidl entered and had practically cleared the intersection.

We turn now to the statutes that fix the rights and duties of the two drivers at the intersection. Sec. 346.39 (1), Stats.,[2] imposed the same duty upon Smidl approaching the flashing red light as if it had been an arterial stop sign. *Sailing v. Wallestad*[3] defines that duty as follows:

"The duty to stop at a stop sign is absolute, followed by a duty of lookout, including a calculation of interference with the right-of-way of other vehicles."

Sec. 346.39 (2), Stats.,[4] is applicable to Seitz's conduct and, while it permitted him to proceed into the intersection without stopping, it required him to do so *"with caution."* This statute makes it clear that a motorist approaching a flashing yellow light does not have the same right to proceed as does a motorist on an arterial or through highway, or a motorist approaching a green light. *Ide v. Wamser*[5] holds that a motorist approaching a flashing yellow signal has a greater duty to properly manage and control his car than does a motorist on an arterial highway or a motorist approaching a green light. In *Wamser* we stated:

"We believe that the legislature intended to impose upon an arterial driver approaching a flashing yellow

[2] Sec. 346.39 (1), provides: "FLASHING RED (STOP SIGNAL). When a red lens is illuminated with rapid intermittent flashes, operators of vehicles shall stop . . . before entering the intersection, *and the right to proceed is subject to the rules applicable after making a stop at a stop sign.*" (Italics supplied.)

[3] (1966), 32 Wis. (2d) 435, 441, 145 N. W. (2d) 725. In accord: *Lundquist v. Western Casualty & Surety Co.* (1966), 30 Wis. (2d) 159, 140 N. W. (2d) 241; *Schlueter v. Grady* (1963), 20 Wis. (2d) 546, 123 N. W. (2d) 458.

[4] Sec. 346.39 (2), provides: "FLASHING YELLOW (CAUTION SIGNAL). When a yellow lens is illuminated with rapid intermittent flashes, operators of vehicles *may proceed* through the intersection or past such signal *only with caution.*" (Italics supplied.)

[5] (1964), 22 Wis. (2d) 325, 126 N. W. (2d) 59.

light a somewhat added caution than that governing other arterial highways." [6]

Decisions which have held that a motorist on an arterial highway has the right to assume that his right-of-way will be respected have invariably held the right to so assume does not excuse the motorist from maintaining a proper lookout.[7]

Nevertheless, subs. (1) and (2) of sec. 346.39, Stats., do impose a greater degree of care upon the motorist who, having come to a stop, enters an intersection against a flashing red light than one who enters upon a flashing yellow light. This factor, if both Smidl and Seitz were equally negligent with respect to lookout, would require a finding of a greater percentage of negligence on the part of Smidl. However, there exists a reasonable basis for the jury to have concluded that Seitz was more negligent with respect to lookout. This is the obtuse angle of the intersection which required Smidl to look somewhat to his rear to observe the Seitz car while Seitz could have observed the Smidl car by looking straight ahead. This, coupled with the fact that Smidl traversed 112 feet of the intersection before the Seitz car came to a stop, enters into the comparison of negligence.

While the apportionment of 50 percent of the aggregate negligence to each driver probably is not one this court would have made, we cannot as a matter of law hold it is not supported by the evidence. In *Wamser* [8] this court let stand an apportionment of 54 percent of the aggregate negligence to the driver on an arterial highway approaching an intersection against a flashing yel-

---

[6] Id. at page 332.

[7] See *e.g.*: *Schmit v. Sekach* (1966), 29 Wis. (2d) 281, 139 N. W. (2d) 88; *Ashley v. American Automobile Ins. Co.* (1963), 19 Wis. (2d) 17, 119 N. W. (2d) 359; *Reddick v. Reddick* (1961), 15 Wis. (2d) 37, 112 N. W. (2d) 131; *Puhl v. Milwaukee Automobile Ins. Co.* (1959), 8 Wis. (2d) 343, 99 N. W. (2d) 163.

[8] *Supra,* footnote 5.

low traffic light and 44 percent against the driver proceeding against a flashing red traffic light.

*Alleged Improper Cross-Examination.*

The questions put to Seitz by plaintiff's counsel on direct examination related solely to his driving and observations up to the time he slammed on his brakes. On cross-examination counsel for defendant was permitted over objection to inquire as to what Seitz did after the near-collision. Such questioning disclosed that within a matter of seconds after the near-collision Seitz turned north onto North Sixtieth street, pursued Smidl, and after three or four blocks overtook and stopped him. Thereupon the parties had a discussion, during which Seitz informed the Smidls of the accident, the fact that his wife was injured, obtained from him information about his driver's license and insurance, and requested the Smidls to accompany the Seitzes to the hospital which the Smidls did.

Plaintiff's counsel objected to this line of questioning on the ground that it was without the scope of the direct examination, which objection was overruled. Thereafter plaintiff's counsel moved that the answers be stricken and the jury instructed to disregard them. The motion was denied. If this were all that was before us with respect to the rulings of the trial court, we would hold they were erroneous but not prejudicial. Seitz was no longer a party to the action at the time he was so examined. Therefore counsel for defendant was not entitled to avail himself of the more liberal rule extending the scope of the cross-examination of a party as distinguished from that of a witness.

There is another fact of record that has a material bearing on the aforementioned rulings of the trial court. The opening statement by plaintiff's counsel to the jury was transcribed and is part of the record. In the opening

statement counsel informed the jury that Smidl left the scene after plaintiff's injury and that Seitz followed and stopped him and "got the necessary information." In view of this we conclude it was not an abuse of discretion for the trial court to permit defendant's counsel to cross-examine Seitz about conduct on his part described in the opening statement.

### Permitting Amendment of Answer.

Initially defendants Smidl and his insurer did not in their answer raise the issue of plaintiff's responsibility for her medical bills. When counsel for defendant at trial inquired into the matter counsel for plaintiff objected to the inquiry as being immaterial and outside the pleadings.

The answer filed by defendant and his insurer with respect to the damage paragraph of the complaint alleged:

". . . defendants deny knowledge and information sufficient to form a belief as to all of the remaining material allegations contained therein."

The foregoing language was insufficient to put in issue the contractual responsibility of plaintiff, a married woman whose husband was living, for the sums of money she expended for medical care and treatment.[9] During the course of trial counsel for defendant and his insurer moved to amend their answer to include the language "and put the plaintiff to her proof" which amendment was allowed by the trial court. Plaintiff contends the trial court's action was an abuse of discretion.

Sec. 269.44, Stats., governs the right to make such an amendment. It provides in part that:

---

[9] *Brown v. Travelers Indemnity Co.* (1947), 251 Wis. 188, 196, 28 N. W. (2d) 306.

"The court may, at any stage of any action . . . before or after judgment, in furtherance of justice and upon such terms as may be just, *amend any* process, *pleading* or proceeding, . . ." (Italics supplied.)

In the recent decision of *Bentzler v. Braun* [10] this court quoted with approval the statement in *Girtz v. Oman* [11] that sec. 269.44, Stats., "gives the trial court wide discretion as to amendment of pleadings."

The answer of plaintiff's husband and his insurer, who settled the very morning of trial, specifically raised the issue of plaintiff's responsibility for medical expenses incurred by language identical to that incorporated by defendant and his insurer in their amended answer. Inasmuch as plaintiff had notice that she was being put to her proof with respect to expenses alleged to have been incurred by her it cannot be said the trial court abused its discretion in allowing the aforesaid amendment.

## *Exclusion of Certain Medical Bills.*

In *Jewell v. Schmidt* [12] this court pointed out that:

". . . a married woman may contract for medical services in her own right, but, in the absence of the establishment of such an express contract between the wife and the person rendering the service, the husband, and not the wife, is the person liable for such expenses and

---

[10] (1967), 34 Wis. (2d) 362, 375, 149 N. W. (2d) 626.

[11] (1963), 21 Wis. (2d) 504, 509, 124 N. W. (2d) 586.

[12] (1957), 1 Wis. (2d) 241, 250, 83 N. W. (2d) 487. See also *Fischer v. Fischer* (1966), 31 Wis. (2d) 293, 142 N. W. (2d) 857; *Sulkowski v. Schaefer* (1966), 31 Wis. (2d) 600, 143 N. W. (2d) 512. For an exception to the general rule see *Seifert v. Milwaukee & Suburban Transport Corp.* (1958), 4 Wis. (2d) 623, 91 N. W. (2d) 236, where the obligation of the wife to pay arose because of an existing contractual relationship between herself and the doctor.

the one entitled to recover for them. *Baum v. Bahn Frei Mut. B. & L. Asso.* (1941), 237 Wis. 117, 295 N. W. 14; *Landskron v. Hartford Accident & Indemnity Co.* (1942), 241 Wis. 445, 6 N. W. (2d) 178."

On the basis of the aforestated rule the trial court excluded various medical expenses incurred by plaintiff. Among the medical bills so excluded were those of a specialist to whom plaintiff had been referred by her treating physician with whom there existed a contract that plaintiff would pay such treating physician's bills. Plaintiff suggests that a contractual relationship should be held to exist where a treating physician refers a patient to a specialist for consultation.

Plaintiff relies upon *Seifert v. Milwaukee & Suburban Transport Corp.*[13] wherein a doctor who was the wife's doctor before and during marriage in an emergency following serious injury to the wife engaged a plastic surgeon and an orthopedic specialist. No discussion was had as to who was to pay the specialists' bills. This court held it was error for the trial court to refuse to permit the wife to recover for the specialists' bills. Such holding was premised on the fact that when the specialists were called in the woman involved was in no condition to make a contract. By her later actions, we said, the wife ratified and approved her doctor's actions. These special facts distinguish *Seifert* from the instant case. Accordingly we hold the trial court did not err in excluding the amount of the specialists' bills as part of plaintiff's recoverable damages.

Dr. Stone treated plaintiff beginning July 19, 1963, through May 29, 1964. Before he began treatments he discussed with plaintiff the question of who was to be responsible for expenses incurred. She agreed she was to be responsible. Thereafter bills sent by Dr. Stone's

---

[13] (1958), 4 Wis. (2d) 623, 91 N. W. (2d) 236. See also 41 Am. Jur., Physicians & Surgeons, p. 256, sec. 142.

office were addressed to plaintiff except one bill dated January 6, 1964, which was addressed to Fred Seitz and which covered treatments from October 29, 1963, to December 13, 1963. That bill was excluded because it was addressed to plaintiff's husband although bills dated prior to January 6th, and subsequent to January 6th, were admitted. Dr. Stone was unable to explain why the one bill was addressed to plaintiff's husband but he stated, "I think it was just sloppy office work." The record does not disclose the amount of the excluded bill.

The exclusion of the January 6, 1964, bill presents a close question. The fact that plaintiff agreed to pay all bills of Dr. Stone would not relieve plaintiff's husband from liability to pay them. There is no evidence that he objected to the January 6, 1964, bill being sent to him, nor of any intention on the part of Dr. Stone to send a corrected bill to plaintiff. Under these circumstances we hold the trial court did not err in excluding the aforementioned bill.

*Alleged Errors in Instructing Jury.*

Part of the instruction given the jury with respect to the question in the verdict, which inquired whether Seitz was negligent, reads as follows:

"A safety statute provides that when a yellow lens is illuminated with rapid intermittent flashes, operators of vehicles may proceed through the intersection or pass such signal only with caution. This means that the operator of a vehicle so proceeding must be prudent with regard to danger, so that injury to person or property may be avoided. The care required of such operator is commensurate with existing and surrounding hazards, and requires him to exercise ordinary care to determine the presence, location, distance and speed of any traffic that might be affected by this movement. After making these observations, the driver is under a duty to make a reasonable calculation as to the time it will take him to safely

proceed into the intersection *without interfering with oncoming traffic or being interfered with by such traffic in the making of such movement.*

"The statute further provides that a driver shall, consistent with the requirements I have just stated, drive at an appropriate reduced speed when approaching and crossing an intersection and when special hazards exist with regard to other traffic.

"In this connection, you are instructed that it is the duty of every driver to exercise ordinary care to keep his vehicle under proper management and control to the end that when danger appears he may stop his vehicle, reduce his speed, change his course, or take such other means to avoid injury or damage as may reasonably appear proper and feasible." (Emphasis supplied.)

Plaintiff contends the italicized portion is objectionable because it implies that Seitz should have stopped for the Smidl car after it came into the intersection. It is claimed this is not the law because Seitz had the right to assume that Smidl would yield the right-of-way because Seitz was traveling on an arterial highway. The statutory requirement that a motorist proceeding into an intersection against a flashing yellow traffic control light must do so with *caution* may necessitate such motorist to stop for other traffic in the intersection in spite of having the right-of-way. Therefore, we find no error in the instruction as given.

The trial court instructed with respect to medical expenses as follows:

"In considering your answer to Question 6 (a), which inquires into medical expenses, you will consider only such bills or parts thereof which have been received in evidence. This means that such medical expenses which were not the obligation of plaintiff form *no part of her cause of action* but such expense which she undertook to pay she may be entitled to recover provided you are satisfied by the preponderance of the evidence to a reasonable certainty that they were reasonable and necessary." (Emphasis supplied.)

Plaintiff's objection to this instruction is that the jury might have interpreted this to mean they were not to consider the testimony of doctors whose bills had been excluded in determining pain and suffering. Any danger, that this instruction standing alone might have been so interpreted by the jury, was removed by the following specific instruction given with respect to the two subdivisions of the damage question (Question 6), covering pain and suffering:

"In answering these subdivisions of Question 6, *you may consider all* the statements and testimony from doctors and hospitals which bear upon the plaintiff's visits to or receiving medical treatments from such doctors and hospitals." (Emphasis supplied.)

The bills covering medical services rendered under circumstances which caused the trial court to rule that there was no contractual obligation on the part of plaintiff were sent to the jury as exhibits with the dollar amounts crossed off. As the jury was retiring a juror or jurors asked the bailiff why certain portions of the bills had been crossed off. This was reported by the bailiff to both plaintiff's counsel and the trial court. Plaintiff's counsel thereupon requested the court to reinstruct the jury with respect to the medical bills. The trial court refused the request to reinstruct because it felt the last quoted instruction, *supra,* which advised the jury that they might consider *all* the medical statements (bills) was sufficient.

Sec. 270.23, Stats., provides:

"**Jury may be reinstructed.** When a jury, after due and thorough deliberation upon any cause, shall return into court without having agreed on a verdict the court may state anew the evidence or any part of it and may explain to them anew the law applicable to the case, and may send them out again for further deliberation; but if they shall return a second time, without having agreed

on a verdict, they shall not be sent out again without their own consent unless they shall ask from the court some further explanation of the law."

The jury had not at the time in question commenced their deliberations, did not "return into court," and did not formally request to be reinstructed or for additional instructions. In any event:

"The *necessity* and extent of *reinstruction* or clarifying instruction to the jury must rest in the sound discretion of the trial judge." (Emphasis supplied.) [14]

The second doctor to treat plaintiff was Dr. Landis, an osteopath, who treated her from April 23, 1962, through August, 1963. He diagnosed her injury to be a compressed fracture of the left transverse process of the atlas. Thereafter, she was treated by Dr. Stone, an orthopedic surgeon, who disagreed with Dr. Landis' diagnosis and found no fracture. Nor did Dr. Coles, defendant's medical expert. Dr. Stone was asked upon cross-examination whether the impression plaintiff had, that she had a broken neck, which Dr. Stone found not to be true, affected her recovery. Dr. Stone answered that the wrong diagnosis did not necessarily prolong her recovery, but could have caused plaintiff to "become much more anxious about it and much more tense about it, about a broken neck than you would about a sprained neck." Plaintiff requested in writing an instruction that, if the jury felt or believed plaintiff suffered additionally because of the diagnosis of a fractured neck and they found the diagnosis was mistaken, plaintiff was not chargeable with such mistaken diagnosis and that dam-

[14] *Olson v. Siordia* (1964), 25 Wis. (2d) 274, 279, 130 N. W. (2d) 827. See also *Fehrman v. Smirl* (1964), 25 Wis. (2d) 645, 657, 131 N. W. (2d) 314; and *Misiewicz v. Waters* (1964), 23 Wis. (2d) 512, 517, 127 N. W. (2d) 776.

ages should not be decreased because of any anguish caused plaintiff in view of the possible over-diagnosis.[15] While we find no error in the requested instruction, we do not believe there was a sufficient basis in the record to make it mandatory upon the trial court to so instruct the jury.

Other questions raised with respect to the instructions have been considered by the court and found to possess no merit.

## *Damages.*

Plaintiff contends the damages awarded are contrary to the credible evidence, are indicative of passion, prejudice and perversity and are inadequate.

Plaintiff's injuries in general consisted of whiplash injury to her neck, back and shoulder injuries involving associated nerves and muscles, a cerebral concussion, a cervical sprain, and injury to her right buttock.

In reviewing the damages awarded by the jury this court is bound by the rule stated in *Springen v. Ager Plumbing & Heating, Inc.,*[16] that:

". . . when there is any credible evidence which under any reasonable view supports the jury finding, especially when the verdict has the approval of the trial court, it should not be disturbed. This is another way of saying the evidence must be viewed in the light most favorable to the verdict. *Kincannon v. National Indemnity Co.* (1958), 5 Wis. (2d) 231, 92 N. W. (2d) 884; *Carpenter v. Farmers Mut. Ins. Co.* (1959), 6 Wis. (2d) 259, 94 N. W. (2d) 652; *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 62 N. W. (2d) 549."

[15] This instruction is grounded upon *Selleck v. Janesville* (1898), 100 Wis. 157, 163, 75 N. W. 975. See also 2 Restatement, Torts, page 1214, sec. 457.

[16] (1963), 19 Wis. (2d) 487, 489, 120 N. W. (2d) 692.

As stated in *Bethke v. Duwe:* [17]

"Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results obtained do not shock the judicial conscience. . . ."

The jury awarded plaintiff $4,000 for pain and suffering to the time of trial and $1,500 for future pain and suffering.

Initially—the first few days following the near-collision—as a result of being thrown forward and against the window or window frame, plaintiff experienced numbness in her left side, pressure in her head, pain in her neck, and a sensation like electricity going through her body, especially in her left hand.

Extensive medical testimony discloses that plaintiff was under the care of various doctors from approximately April 10, 1962, through December of 1965, who treated her with diathermy, traction, collars and medication, etc. She was hospitalized from February 21st to March 14th in 1964, and from November 8th to November 20th in 1965.

Dr. Landis, the osteopath who commenced treating her shortly after the accident, fitted plaintiff with a "collar" or cervical brace which she was required to wear four weeks, day and night. The pain and pressure she experienced shortly after the accident persisted into the summer of 1962 when she experienced some relief although she had trouble sleeping and was still required to wear the brace or collar. When the weather turned cold she again experienced pressure, pain and headaches which persisted into the summer and which appeared to

[17] (1950), 256 Wis. 378, 385, 41 N. W. (2d) 277. Quoted with approval in *Makowski v. Ehlenbach* (1960), 11 Wis. (2d) 38, 41, 43, 103 N. W. (2d) 907, and *Olson v. Siordia* (1964), 25 Wis. (2d) 274, 283, 284, 130 N. W. (2d) 827.

worsen during humid weather. In the summer of 1963 she began taking the brace off for short intervals, and could leave it off when she did not walk.

From then on there was gradual improvement. Plaintiff admitted she was able to return to work at American Motors by January, 1966. At the time of trial she complained of pain in her shoulder and neck which reoccurred daily at about 1 p. m. and which lasted for an hour to an hour and a half. She also stated she still had trouble reaching with her left arm, and was required to wear the collar when she drove and when the weather was bad. She was able, however, to do most of her housework and to sew.

Most of plaintiff's injuries were manifested subjectively. Medical testimony, however, disclosed some objective evidence of injury. Plaintiff's medical experts testified to opinions based on a reasonable degree of medical certainty that the injury to plaintiff's neck and shoulder was permanent. On the other hand, defendant's medical expert, Dr. Coles a specialist in orthopedic surgery who examined plaintiff, gave his opinion based on a reasonable medical probability that her injury did not disable her from performing her work at American Motors for more than ten weeks.

Based on this record we cannot hold the awards for past and future pain and suffering are so low as to shock the judicial conscience although we deem them low.

We turn now to the $6,000 award for loss of earnings. Plaintiff at the time of the accident was working as a sewing machine operator at American Motors Corporation and was earning $2.69 per hour, or $107.60 per week.

There is considerable medical testimony of record concerning plaintiff's inability to engage in employment subsequent to the accident of April 6, 1962. Dr. Merle Landis, who treated plaintiff for approximately sixteen months commencing April 23, 1962, testified that she would have been unable to work during the time he treated her. Dr. Stone, who treated plaintiff from July

19, 1963, through May 29, 1964, testified it was his opinion, based on a reasonable medical probability, that it would have been "most difficult" for her to work at her employment during the time he treated her. Dr. Ullrich, a neurological surgeon, who treated plaintiff from December 7, 1964, through November 3, 1965, testified to a reasonable degree of medical certainty, in answer to a hypothetical question, that at the time he had seen plaintiff she would have been unable to work at her employment. Finally, Dr. James McDermott, a specialist in physical medicine, testified to a reasonable degree of medical certainty based on his examination of plaintiff starting June 1, 1965, through the end of 1965, that she would not during that time have been able to engage in her employment at American Motors.

The jury could, however, and apparently did, place much reliance on the testimony of Dr. Coles, defendant's medical expert. As previously mentioned, he testified that plaintiff should have been disabled from engaging in her work at American Motors for less than ten weeks. On the basis of his testimony the jury could conceivably have awarded plaintiff only $1,076 for loss of income.

Viewing the evidence in the light most favorable to the verdict, as we must, it nevertheless appears that the award is low, but not so unreasonably low as to shock the judicial conscience.

Lastly, plaintiff complains of the award of $1,800 for medical expenses when the bills actually admitted into evidence with the amounts not crossed off aggregated $2,689.

With respect to medical expenses the jury is not required to return an award to compensate for the exact amount expended by the person seeking recovery. In Ghiardi, Personal Injury Damages in Wisconsin, at page 83, sec. 6.01, it is said:

"Medical expenses are recoverable as part of compensatory damages to the extent of the amount reason-

ably and necessarily paid or incurred for . . . treatment."

The amount paid or liability incurred is merely evidence which can go to the jury to assist it in arriving at a reasonable award.[18]

The trial court, in commenting on this element of damages in the memorandum decision, stated:

". . . the Court feels it has no power to interfere with the jury's finding for it is apparently predicated on their belief that some of the medical expenses though proven to be the obligation of the plaintiff were not necessary."

We conclude the award for medical expenses was for the jury to determine.

The trial court found no evidence of passion or prejudice in any of the damage awards made by the jury, nor do we.

### Bailiff's Communication with the Jury.

Under the heading "Alleged Errors in Instructions" we have alluded to the incident in which the bailiff informed the trial court of the inquiry made by one of the jurors about the medical bills which had the dollar amounts blocked out. The inquiry was made as the jury was entering the jury room and before they had elected a foreman.

After the verdict was rendered plaintiff's counsel filed a petition "to enlarge the record" in order to establish the facts of the incident. A hearing was held on this petition at which the only witness sworn was Chapp, the bailiff. In answer to the question as to what transpired he testified as follows:

"*A.* Well, when I took the exhibits up there, and I laid them on the table, I was on the way out. Someone asked or inquiry was made about some of the exhibits,

[18] 22 Am. Jur. (2d), Damages, page 149 *et seq.*, secs. 102, 103.

and I made the statement that there is twelve people on the jury, and they should remember what—

"Q. (Interposing) What was asked about the crossed off portion? A. They just asked what about the crossed off portion.

"Q. What did you say? A. They just asked why are these blocked out, that's all.

"Q. All right. What was your response at that time? A. Well, I told them there is 12 people sitting on the jury, and it is up to them to remember what they should—what is pertinent and what isn't pertinent."

Of course the bailiff should have refused to answer any inquiry from a juror other than to inform him that any communication must be by the jury foreman and would have to take place in open court. However, it is difficult to perceive how this innocuous occurrence could in any manner have resulted in prejudice to plaintiff. Since *Wegner v. Chicago & N. W. R. Co.,*[19] this court has stood by the rule that a communication with the jury is not sufficient to warrant a new trial in the absence of prejudice.[20] The holding in *Wegner* was a departure from the earlier strict rule applied in *Wiedenhaupt v. Hoelzel,*[21] that any improper communication with the jury, or a juror called for a new trial.

Because there is no showing of prejudice, the instant communication affords no basis for a new trial grounded on error.

### *New Trial in the Interest of Justice.*

One of the grounds on which plaintiff moved for a new trial in the trial court was in the interest of justice.

[19] (1952), 262 Wis. 402, 55 N. W. (2d) 420, 41 A. L. R. (2d) 279.

[20] *Pollack v. Olson* (1963), 20 Wis. (2d) 394, 401, 122 N. W. (2d) 426. Related cases are collated in Anno. 41 A. L. R. (2d) 288, Prejudicial effect, in civil case, of communications between court officials or attendants and jurors. See also 4 A. L. R. (2d) 734, later case service.

[21] (1948), 254 Wis. 39, 35 N. W. (2d) 207.

In commenting on this motion the trial court stated in its memorandum decision:

"The interests of justice do not require a new trial. There is, as we previously stated, credible evidence to support the findings of the jury and this is all that is necessary to sustain the verdict. We are unable to find the jury was moved by passion or prejudice or that there is perversity in the verdict.

"True, larger amounts in the damage portions of the verdict as well as changes in the negligence findings would have been upheld by the Court in view of the sharp contest. But in examining all of the evidence we find that the jury was well justified in returning the verdict as they did."

This court is very reluctant to grant a new trial in the interest of justice where the trial court has carefully considered the advisability of so doing and has given a sound reason, or reasons, for not granting a new trial on that ground.

As previously mentioned, we would have been better satisfied if the jury had apportioned a somewhat greater percentage of negligence against Smidl. On the other hand, had the jury attributed 55 percent of the aggregate negligence to Smidl, this would have met our complete approval. However, if the jury had so found, the net result would have been to increase plaintiff's damages but 10 percent. This is not a situation that cries out for relief by way of this court ordering a new trial in the interest of justice.

*By the Court.*—Judgment affirmed.