SHELTON, Plaintiff in error, v. STATE, Defendant in error.

*No. State 10. Argued January 7, 1971.—Decided February 2, 1971.*
(Also reported in 183 N. W. 2d 87.)

---

[7] *Girtz v. Oman, supra,* footnote 4.

For the plaintiff in error there was a brief by *James D. MacDonald,* attorney, and *Eugene W. Lenartz* and *Brown & Lenarty* of counsel, all of Union Grove, and oral argument by *Mr. MacDonald.*

For the defendant in error the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, *William A. Platz,* assistant attorney general, and *Gerald E. Clickner,* district attorney of Racine county.

BEILFUSS, J. Although the writ of error was requested and issued to review the judgment of November 17, 1969, the sole issue presented upon this appeal is whether the trial court abused its discretion in refusing to grant the defendant's motion for a mistrial or new trial because of the alleged misconduct of two alternate jurors.

The trial in this case commenced on October 21, 1969, and the jury returned its verdict on October 23, 1969. After the regular 12 member jury had been selected, the trial court ordered that two alternate jurors also be selected. During the first two days of the trial the alternate jurors occupied chairs next to the jury box. The jury was sequestered during the trial, and the two alternate jurors ate their meals with the regular jurors and were lodged with them at a hotel in Racine. During all adjournments and recesses in the course of the trial the alternate jurors accompanied the regular jurors to the jury room. At all times when the jury was not seated in the courtroom it was in the custody of the bailiffs, Mr. Louis Zilla and Mrs. Bonnie Fuller.

During the morning of October 23d, the third and last day of the trial, after the court had recessed for thirty minutes so that the defense attorney could visit a doctor near the courthouse to have a foreign object removed from his eye, the two bailiffs advised the court that the alternate jurors were creating a disturbance in the jury room and voicing dissatisfaction about the manner in which the trial was being conducted.

The trial judge immediately brought the alternate jurors before the court while the other jurors remained in the jury room, but in the presence of the attorneys and the defendant the following transpired:

"*The Court:* Both of you gentlemen step up before the bench please. Mr. Scheckler, I understand that you have made some derogatory remarks about the procedure of this court.

*"Mr. Scheckler:* I made . . . I felt that the thing has been unnecessarily slowed down by the defense attorney.

*"The Court:* He has not done anything on his part to slow these proceedings down. When we go out into the chambers we are talking about questions of law, not questions of fact. The jury finds the questions of fact in their deliberations. Questions of law are not properly made before the jury and that is the reason we have to go out. The problem this morning was, if you ever had to be with a doctor, a doctor's appointment they are hard to get. And the court doesn't unnecessarily want to take them. For them to take care of their patients, we have to fit in their schedules and that was the reason for the delay this morning about the doctor. Mr. MacDonald had to have work done by an eye doctor across the street. He had two eyelashes which were under his lid that couldn't be taken care of. Yesterday he tried Murine to get it flushed out, and that didn't work. His vision was blurred this morning. That is the reason that he went to see the doctor this morning, because Dr. Harris made arrangements so he could see a doctor. I don't know what doctor he saw.

*"Mr. MacDonald:* I don't know either. Dr. Harris took me over across the street.

*"The Court:* I understand you have been dissatisfied.

*"Mr. Ernst:* The time element seems like it has been dragging really.

*"Mr. Scheckler:* We all are.

*"The Court:* Murder trials don't move as expeditiously as other trials do. Now I am sure that you read in the papers about the Sirhan trial, and other trials, murder trials that have been held throughout the country. But they go several weeks. They had a trial up in Milwaukee, a murder trial that went I believe about three weeks. Jury trials are cumbersome and they take time. But until a better system is devised to handle the relationships between the law enforcement and their behavior in society and through the court system we have, until another is devised, this is the one we are going to have to take. And I don't have to point out to either one of you gentlemen once the court system is broken up through the lack of response by its citizens to carry out their obligation in society, that by default other forms of government take over. The first thing that happened

in Germany when Hitler went in, he destroyed the court system.

"*Mr. Scheckler:* May I ask something? Don't you think that the legal profession might help destroy itself?

"*The Court:* In what way is that, sir?

"*Mr. Scheckler:* You know that people, the citizenry are getting impatient with court procedures throughout the country, and these long court trials are regarded as really not right.

"*The Court:* Well . . .

"*Mr. Scheckler:* Taxpayer's money.

"*The Court:* No it is no longer possible, and should never be possible to have kangaroo courts.

"*Mr. Scheckler:* No, no, I agree with you on that.

"*The Court:* Well, as long as you are speaking your piece, what do you think should be done?

"*Mr. Scheckler:* I think it should be the people who have been injured there should be more regard given to them than it is for the defendants in most of these cases.

"*The Court:* But there is a presumption of innocence until they are found guilty. Don't you believe in that?

"*Mr. Scheckler:* Oh yes, but not in this case, not him. We just feel that the jurors and county taxpayers are being taken advantage of by maybe the attorneys. I know what your position is because otherwise . . . well he didn't give us time, but I believe these cases, to get good jurors and people willing it should be, attorneys should be made to have the witnesses there the same as the jurors, be there on time, and also some resentment when a juror is locked up, the defendant is running loose, there is some resentment on that. I think that is a miscarriage.

"*The Court:* Miscarriage, Mr. Scheckler, is what you are doing. If we had to cause a mistrial because of your conduct, think of the money you would cost the county.

"*Mr. Scheckler:* That would be the end of the legal profession.

"*The Court:* It would be you, by your conduct. When you were asked if you would be able to follow the instructions and presumption of innocence, why didn't you say 'no'?

"*Mr. Scheckler:* We have not been asked that, this complaint about procedures. We feel that the attorney probably takes advantage of us.

"*The Court:* No attorney is taking advantage of you, or the court. I think an order to show cause why Mr. Ernst and Mr. Scheckler, why they shouldn't be held in contempt of this court, should be forthcoming. Both of you are excused and you will hear from the court in the near future. I don't want these gentlemen in the jury room."

The court entertained defense counsel's motion for a mistrial but held its ruling in abeyance. The trial continued before the regular jury, and after the jury had retired to deliberate on its verdict the court heard the testimony of the two bailiffs concerning the disturbance caused by the alternate jurors.

The bailiff, Mrs. Bonnie Fuller, testified that as the jury was returning to the jury room during the recess, called to allow defense counsel to see a doctor about his eye problem, she heard Mr. Scheckler say, " 'I have had it. Tonight I am going to get my coat, I am going to get . . . I am going to leave.' " She told him that he could not do that and he responded, " 'The hell I can't.' " He then said, " 'I have stood for all the fooling around I am going to stand for.' " She advised him that he would be held in contempt of court and he responded " 'I don't care.' " Mrs. Fuller said she was afraid that Scheckler might disturb the other jurors and so she went to report the incident to the judge. She also testified that she heard the women jurors say, " 'It is not only Mr. Scheckler that has discussed it, Mr. Ernst said that when this trial was over he was going to stir up into things, and he was going to get to the bottom of it.' "

Mrs. Fuller stated that the two regular men jurors were in the same room when Mr. Scheckler made his remarks, and that she then closed the door leading to the room where the women jurors were located and that this effectively cut off all conversation so that the women jurors could not hear anything further that was said.

As far as she heard, Mrs. Fuller stated that he did not say anything about the defendant or the case, but that Mr. MacDonald "could have had that taken care of last night," apparently referring to his eye problem.

The bailiff, Mr. Louis Zilla, testified that when the jury had returned to the jury room and the two alternate and two regular men jurors were in their room, Mr. Scheckler started "raving, calling out loud, talking and not approving of the attorney going to the doctor, constitutes a delay, unnecessary delay, that he could have taken care of that sooner like yesterday or early this morning." He stated that Mr. Ernst joined in and seemed to agree with Mr. Scheckler about the delays and that he was going to do something about it when he got through with the case. He stated that Mr. Scheckler did not say anything about the case, the witnesses, the district attorney's office, or the defendant, but only about Mr. MacDonald being allowed too much leeway and causing delay by going to the doctor.

Mr. Zilla stated that he did not think so but that maybe some of the women jurors in the other room had heard the remarks. He also testified that none of the other jurors made any response to Mr. Scheckler's or Mr. Ernst's remarks but rather seemed not to pay any attention to what was going on. Mr. Zilla testified that he and Mrs. Fuller alternated in going down to report to the trial judge so that one of them was with the jury at all times.

After the jury had returned its verdict the court asked the jury the following questions:

*"The Court:* This morning two of the, or the two alternate jurors had voiced some expressions. Did any of you hear those statements made by either Mr. Scheckler or Mr. Ernst? I am to gather that none of you heard any statements made this morning after the recess to permit Mr. MacDonald to go to the eye doctor? I gather from that, if anything was said, at least you didn't hear

it. And what I am driving at of course, is if anything was said, would those statements have any bearing on how you arrived and made your deliberations in this case? I take it that by your silence that nothing was said that would affect your deliberations in this case. Thank you very much. Is there anything further that you gentlemen would like to say?

"*Mr. Ruzicka:* I would like to renew my motion, your Honor.

"*The Court:* There will be motions after verdict . . .

"*Mr. Ruzicka:* I have nothing further, your Honor.

"*The Court:* . . . after sentencing.

"*Mr. MacDonald:* I would like to reiterate for the record, your Honor, that the court after receiving the jury's verdict asked the entire panel if anyone had heard the statements made by the two alternate jurors, and the indication was in the negative, that no one heard these."

Prior to sentencing on November 17, 1969, the court heard the arguments of the district attorney and defense counsel on the motion for a mistrial. The court then reviewed the testimony of the two bailiffs and stated that in order to grant a mistrial it would be necessary to find that the defendant's substantial rights were prejudiced and that the misconduct prevented a fair trial. It concluded that the conduct of the alternate jurors here was not of such gravity and denied the motion. In considering the jury's negative response by remaining silent when questioned by the court concerning the incident, the court concluded that the jurors did not attach any importance to the statements made by Scheckler and Ernst. It stated that the main thrust was that if they did hear anything it did not affect their deliberations.

The defendant, in his brief, has cited several cases from other jurisdictions and other authority [1] to generally support the proposition that a trial must not only be free from prejudice but free from the appearance of prejudice. Several of our earlier cases are consistent

---

[1] 53 Am. Jur., *Trial*, pp. 681–691, secs. 970–990.

with this rule; [2] however, the rule has been relaxed to the extent that there must be some showing of probable prejudice.

In *Seitz v. Seitz* (1967), 35 Wis. 2d 282, 306, 151 N. W. 2d 86, we stated:

". . . However, it is difficult to perceive how this innocuous occurrence could in any manner have resulted in prejudice to plaintiff. Since *Wegner v. Chicago & N. W. R. Co.*, this court has stood by the rule that a communication with the jury is not sufficient to warrant a new trial in the absence of prejudice. The holding in *Wegner* was a departure from the earlier strict rule applied in *Wiedenhaupt v. Hoelzel*, that any improper communication with the jury, or a juror called for a new trial.

"Because there is no showing of prejudice, the instant communication affords no basis for a new trial grounded on error." [3]

In 24B C. J. S., *Criminal Law*, p. 250, sec. 1927 f., the rule is stated in this manner:

"Remarks or discussion of jurors concerning matters outside the evidence and not relevant to the issues does not constitute reversible error unless injury and prejudice to accused is shown. . . ."

The alleged misconduct in this case was not that of a party, a witness, interested person, the bailiffs, the court, the attorneys nor the jurors themselves, but the ill-advised statements of alternate jurors. It is obvious the two alternate jurors associated with the regular jury

---

[2] *See: State v. Cotter* (1952), 262 Wis. 168, 54 N. W. 2d 43; *Surma v. State* (1952), 260 Wis. 510, 51 N. W. 2d 47; *La Valley v. State* (1925), 188 Wis. 68, 205 N. W. 412; *O'Connor v. Brahmstead* (1961), 13 Wis. 2d 432, 435, 436, 108 N. W. 2d 920; *Rasmussen v. Miller* (1955), 268 Wis. 436, 440, 68 N. W. 2d 16; *State v. Sawyer* (1953), 263 Wis. 218, 226, 56 N. W. 2d 811.

[3] *Cullen v. State* (1965), 26 Wis. 2d 652, 133 N. W. 2d 284; *Dostal v. Saint Paul-Mercury Indemnity Co.* (1958), 4 Wis. 2d 1, 89 N. W. 2d 545.

panel for a period of two and one-half days during the trial but there is nothing in the record to demonstrate that they attempted to influence the regular jurors against the defendant. The only statement derogatory to the defendant by the alternate jurors concerning the presumption of innocence was made outside the presence of the regular jury and in response to a question by the court. The ill-founded complaints of the alternate jurors were directed to trial procedures and the legal profession and not toward the defendant.

The trial judge properly called the alternate jurors into open court and interrogated them as soon as he was aware that any question of misconduct existed. He rightfully discharged them when they expressed their improper attitude toward trial procedures.

It is clear the alternate jurors took no part in the jury's deliberations after instructions. There is nothing to show that any of the jurors who deliberated in the case were in any way persuaded or prejudiced by the misconduct of the alternate jurors. It is significant that the jury returned a verdict of the lesser included count of manslaughter when the defendant was charged and the jury instructed on first-degree murder. (The record reveals the defendant shot the deceased in the head at close range while trying to stop the deceased from physically assaulting a relative.)

The defendant also argues that failure of any of the jurors to individually respond to a question put to them, after the return of the verdict, as to whether they heard any remarks or statements made that morning by the alternate jurors constitutes prejudicial error. If the defendant was dissatisfied with the response of the jury he or his counsel could have questioned the jury individually. Without such questions he cannot now complain of a lack of response. The trial court's further questions and interpretation, that though the jurors

physically heard the remarks they did not listen to the extent of attaching importance to the remarks, are reasonable and no prejudicial error is apparent.

We conclude that there was no prejudicial error because of the misconduct of the alternate jurors and that the trial court did not abuse its discretion in denying the motions for a mistrial or a new trial.

*By the Court.*—Judgment affirmed.