LUNDQUIST, Respondent, v. WESTERN CASUALTY & SURETY COMPANY and another, Appellants.

*February 1—March 1, 1966.*

160

For the appellants there were briefs by *Chambers, Nash, Pierce & Podvin* of Wisconsin Rapids, and oral argument by *Lloyd L. Chambers* and *Lawrence R. Nash.*

For the respondent there was a brief and oral argument by *Herman J. Glinski* of Stevens Point.

CURRIE, C. J.  These two issues are presented by the instant appeal:

(1)  Was plaintiff's causal negligence equal to at least 50 percent of the total aggregate causal negligence of himself and defendant?

(2)  Did the trial court commit error which affected the amount of damages awarded plaintiff?

*Comparison of Negligence.*

In the area of the accident the paved portion of Highway 13 is 22 feet wide with an 11-foot shoulder on the east, and a nine-foot shoulder on the west.  There are no hills or curves at this point which would obstruct the view of a southbound driver such as plaintiff.

Plaintiff testified he first saw defendant's car stopped on Lincoln avenue when approximately 1,000 feet north of the intersection of Highway 13 and Lincoln avenue. As he approached the intersection, traveling at a speed of 60 to 65 miles per hour, he saw a car approaching from

the opposite direction signaling for a left turn. Plaintiff momentarily took his foot off the accelerator to make sure the approaching car made its turn safely, and then resumed his speed of 60 to 65 miles per hour. Defendant then entered Highway 13 from Lincoln avenue. The evidence is in conflict as to how far north of the intersection plaintiff's car was when defendant pulled out. Upon adverse examination plaintiff testified to this distance being 500 feet but on trial he said he was "a lot closer" than that. Defendant testified that when her car entered the intersection plaintiff's car was between the third and fourth telephone poles north of the intersection. The third and fourth telephone poles are respectively 342 feet and 427 feet north of the intersection. Plaintiff testified that upon entering the intersection defendant's car angled across the entire highway toward McMillan street.

According to plaintiff, defendant's car was only 60 to 80 feet south of the Lincoln avenue intersection when he veered around it. On the other hand the visible skid marks laid down by plaintiff's car commenced 179 feet south of this intersection and extended up and across McMillan street a distance of 154 feet.

Appellants contend that plaintiff should have decreased his speed when he saw defendant's car stopped at the stop sign, and in any event he had time, after he first saw defendant proceed into the intersection, to have stopped his car before overtaking her. In support of the latter contention appellants cite Wisconsin's Manual for Motorists published by the motor vehicle department which states that the stopping distance of a car traveling on dry, level pavement at 60 miles per hour is 366 feet.

A driver on an arterial highway, such as plaintiff, has no duty to slow down in anticipation that the user of an intersecting highway will not yield the right-of-way.[1] In

---

[1] *Schlueter v. Grady* (1963), 20 Wis. (2d) 546, 553, 554, 123 N. W. (2d) 458; *Lawrence v. E. W. Wylie Co.* (1954), 267 Wis. 239, 244, 64 N. W. (2d) 820.

spite of the fact that plaintiff clearly had the right-of-way, defendant pulled onto Highway 13 with plaintiff's car traveling at a high speed admittedly in view. This court has noted that a driver entering an arterial not only has a duty to stop, but "is obliged to stop, observe, and calculate before entering the arterial highway." [2] As this court said in *Schlueter v. Grady:* [3]

"It is a fundamental rule of law that one approaching an arterial highway is obliged to stop, look, and think. A motorist proceeding on an arterial has the right to assume that a driver approaching the arterial on a nonarterial street will not only physically stop his car for the arterial, but he will also not proceed into the intersection without first ascertaining whether he can do so with safety. See *Schmit v. Jansen* (1945), 247 Wis. 648, 20 N. W. (2d) 542; *Kraskey v. Johnson, supra* [(1954), 266 Wis. 201, 63 N. W. (2d) 112], *Magin v. Bemis* (1962), 17 Wis. (2d) 192, 199, 116 N. W. (2d) 129."

The jury could well conclude upon the testimony most favorable to plaintiff that defendant was guilty of the greater negligence when she drove out onto Highway 13 directly into the path of plaintiff's oncoming car thereby requiring plaintiff to take quick affirmative action to avoid a collision such as stopping, greatly reducing the speed of his car, or successfully negotiating the east shoulder to veer around her car. Viewing the conflicting evidence most favorably to plaintiff, as we must on this appeal,[4] we cannot hold that plaintiff's negligence as a matter of law is equal to, or exceeds, that of defendant.

### Errors Affecting Damage Award.

The total damages awarded by the jury were $18,300.33, which included (1) $2,990 for loss of earnings for the

---

[2] *Plog v. Zolper* (1957), 1 Wis. (2d) 517, 528, 85 N. W. (2d) 492.

[3] *Supra,* footnote 1, at page 555.

[4] *Lane v. Collins* (1965), 29 Wis. (2d) 66, 70, 138 N. W. (2d) 264; *Zartner v. Scopp* (1965), 28 Wis. (2d) 205, 209, 137 N. W. (2d) 107.

three-month period following the accident, (2) $1,310.33 for medical, dental and hospital care, automobile damages, and miscellaneous expenses, and (3) $14,000 for plaintiff's personal injuries. Appellants only contest the $14,000 award for personal injuries.

The most serious of plaintiff's injuries was a severe head laceration extending from near the top of the head, around behind the right ear, and ending at the corner of the jaw on the right side of the head. The cut extended in depth to the skull bone leaving the external ear attached only by a loose flap of skin. The attending physician, Dr. Charles Vedder, testified that it took over 100 sutures to close the wound and place the external ear back in the proper position. Dr. Vedder stated that he saw plaintiff for the last time on January 18, 1964, and at that time felt there had been a "very excellent result considering the severity of the injury." The wound did leave a permanent scar, but Dr. Vedder testified that because of the location of the scar there was no disfigurement. We assume that the reason for there being no disfigurement is that the portion of the scar not lying within the hairline is hidden behind the right ear. He further stated that there was no permanent disability and no impairment to plaintiff's hearing.

Plaintiff testified that he has a numbness and loss of feeling on the right side of his head and it feels as if his ear is sitting off to one side. He further stated that the ear gets colder "a lot quicker" than the left ear and he is scared he is going to freeze it. Dr. Vedder testified that the reason for the numbness and sensitivity to cold is probably due to nerve damage and impaired circulation of the blood vessels separated by the laceration.

Plaintiff's second major injury was a double fracture of the jaw. This was treated by Dr. R. W. Mason. On December 6, 1963, the upper and lower jaws were wired together, and the wiring remained until January 22, 1964. Dr. Mason last examined plaintiff on January 30, 1964,

and felt that at that time plaintiff had good occlusion, but still could not fully open his mouth because of stiffness from the jaw previously being wired shut. Dr. Mason testified that there might be some residual stiffness or loss of motion in the lower jaw, but could not say definitely that there would be such residual stiffness or loss of motion. Plaintiff did not testify to any such residuals.

Plaintiff also testified that Dr. Kort, a dentist, extracted seven teeth because they were chipped, filled several others, and made an impression for a partial plate.

Other injuries consisted of small contusions, and bruises to the ribs, back and shoulders which cleared up reasonably fast. Plaintiff suffered considerable pain and discomfort. He was able to return to his work as a railroad conductor and brakeman three months after the accident and since returning has lost no time from work because of the accident.

Appellants contend that the trial court committed certain errors during the course of trial which were reflected in the large amount of damages awarded for personal injuries. We will consider these seriatim.

The original hospital record pertaining to the treatment of plaintiff immediately following the accident was received in evidence as Exhibit 14. However, it then appears that without the knowledge of plaintiff's attorney the record was taken back to the hospital by the medical-records librarian. Plaintiff's counsel offered a purported Xerox copy of the record as a substitute but adduced no testimony to establish that it was a true copy of Exhibit 14. The trial court accepted this copy as Exhibit 14A over the objections of appellants' counsel. Now appellants claim that the trial court erred in receiving this document in evidence because it was received without proper identification or foundation.

Appellants, however, have failed to point out how they were prejudiced by the introduction into evidence of the

purported Xerox copy of plaintiff's hospital record. In the absence of a showing of prejudice we hold that this was harmless error entitling appellants to no relief.[5]

Appellants further contend that the court erred in refusing to instruct the jury with respect to the failure of plaintiff to produce his dentist, Dr. Kort. The trial court denied defendant's request for the following instruction in Wis J I—Civil, Part I, 410:

"You are instructed that if a party fails to produce the testimony of an available witness as to a material fact of the case, and it would appear naturally in the interest of that party to produce him, and the party fails to give a satisfactory explanation for his failure to produce the witness, you may infer that the evidence which he would give would be unfavorable to the party failing to produce such witness."

At the commencement of trial the parties stipulated that certain bills could be received in evidence without further proof and that these bills were reasonable and the services performed were necessary. One of these bills was Dr. Kort's in the amount of $273 which covered the extraction of seven teeth, filling others, and making an impression for a partial plate. By stipulating to the reasonableness of this bill and its admission into evidence appellants conceded that the dental services listed thereon were made necessary by the accident. The only item of dental damage testified to by plaintiff and not reflected in this bill is the looseness of some of his remaining teeth. Plaintiff's testimony of permanent impairment to his teeth was meager at best. After testifying as to what work the dentist did on him, he said as to the rest of his teeth, "They are good. They haven't given me any trouble except the lower front ones are a little loose." Plaintiff also testified that if he bit the wrong way his teeth bothered him a little because they were loose, but aside from that they did not trouble him at all.

[5] See *Zartner v. Scopp, supra,* footnote 4, at page 219; and *Holtz v. Fogarty* (1955), 270 Wis. 647, 650, 72 N. W. (2d) 411.

Under these circumstances we consider the failure of plaintiff to call Dr. Kort as a witness gave rise to no inference that if called to testify, he would have testified that the loose teeth were not caused by the accident. It was a *de minimis* item of damage at best. Therefore, we find no error in the refusal to give the requested instruction.

A third claimed error affecting the award of damages was the giving of an instruction to the jury that they could consider impairment of plaintiff's future earning capacity. Appellants contend the record does not support an inference that any such impairment exists.

Plaintiff works as a brakeman and conductor for the Soo Line railroad. He testified that the only aftereffect of the injuries sustained in the accident was the loss of feeling on the right side of his head and the sensitivity of his right ear to the cold. He did not testify that his hearing was impaired in any way, but only that his ear's sensitivity to cold necessitates covering it in warmer weather than he normally would, and that this affects his employment because he uses his ears considerably in his work. He did not explain in what way this affected his employment. It would be pure speculation to infer from this statement that plaintiff's earning capacity was impaired.

Plaintiff returned to work on March 2, 1964, just three months after the accident and worked steadily from that time until the date of the trial, April 19, 1965. There was no evidence introduced that plaintiff was unable to perform any part of his regular duties, or that he had even been hampered in performing any of these duties.

In *Behringer v. State Farm Mut. Automobile Ins. Co.*[6] the injured plaintiff returned to her work as a beauty-parlor operator approximately three months after her accident. Major residuals from her injuries consisted of facial scars, a numb area above her eye, a twitching eye,

---

[6] (1959), 6 Wis. (2d) 595, 95 N. W. (2d) 249.

a knee that was painful when kneeling, and a thumb injury which caused pain when heavy objects were lifted. This court found the trial court had erroneously instructed the jury to consider impairment of plaintiff's earning capacity, stating the following concerning the residual results of her injuries:

"These results were all present during the three years and one month which elapsed between the plaintiff's resumption of work on December 14, 1954, and the date of trial. If any of such permanent injuries were going to impair the plaintiff's earning capacity, such impairment most likely would have manifested itself during such period. In the absence of any evidence that such impairment so occurred, it was error to have given the instruction complained of." [7]

Similarly in the instant case plaintiff has returned to work for more than a year and there is no evidence that his earning capacity is impaired. Plaintiff contends that this court does not require *substantial* evidence of impairment of earning capacity for the trial court to be justified in giving the jury this instruction. Plaintiff relies on *Spleas v. Milwaukee & Suburban Transport Corp.*[8] where this court upheld an instruction on "loss of earning capacity" even when the "element of potential damage was very meager." However, in *Spleas* the court noted that plaintiff testified that he was not able to do his regular work, and as a result "received only a few small pay raises since the date of the accident, while other employees received more raises." The court felt that these facts distinguished the *Spleas Case* from the *Behringer Case* "where there was a complete absence of loss of earning capacity." [9]

We hold there was insufficient evidence to warrant giving the instruction with respect to impairment of

[7] Id. at pages 601, 602.

[8] (1963), 21 Wis. (2d) 635, 124 N. W. (2d) 593.

[9] Id. at page 642.

earning capacity and it was therefore error to so have instructed the jury.

Our review of the evidence with respect to damages convinces us that if the element of possible impairment of future earning capacity be eliminated $10,000 would be a reasonable amount to award plaintiff for personal injuries. Therefore, under the precedent of the *Powers Case* [10] as modified by *Spleas,* [11] the case will be remanded to the trial court with instructions to enter a formal order for a new trial on the issue of damages only, unless within twenty days after the return of the record to the trial court the plaintiff files a consent with the clerk to remit $2,400 (60 percent of $4,000) of the instant judgment. If the appropriate notice of his election to remit such amount is given by plaintiff, then in lieu of the order for new trial the circuit court should enter a judgment for the proper reduced amount.

*By the Court.*—Judgment reversed and cause remanded with directions. Appellants are entitled to tax one half of their costs on this appeal.

[10] *Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 102 N. W. (2d) 393.

[11] *Supra,* footnote 8.