HOEFT, Respondent, v. MILWAUKEE & SUBURBAN TRANSPORT CORPORATION and another, Appellants.*

No. 195. *Argued May 6, 1969.—Decided June 3, 1969.*
(Also reported in 168 N. W. 2d 134.)

* Motion for rehearing denied, with costs, plus an additional $25 costs (for violation of Supreme Court Rule 251.67 limiting brief to 10 pages) on September 8, 1969.

700

702

For the appellants there were briefs by *Kivett & Kasdorf,* attorneys, and *Alan M. Clack* of counsel, all of Milwaukee, and oral argument by *Mr. Clack.*

For the respondent there was a brief by *Robert F. Buech* and *Kersten & McKinnon,* attorneys, and *E. Campion Kersten* of counsel, all of Milwaukee, and oral argument by *E. Campion Kersten.*

HEFFERNAN, J.

> *Did the trial court err in instructing that the pedestrian had the right-of-way in crossing a street at an intersection where intersecting vehicular traffic was required to stop for posted signs*

The trial judge, in essence, gave the jury the standard Wisconsin Jury Instruction, Civil, Part I, 1255, which recites that at a crosswalk or at an intersection not controlled by traffic control signals or by a traffic officer, the operator of a vehicle shall yield the right-of-way to a pedestrian who is crossing the highway within a marked or unmarked crosswalk. The court also included the admonition that a vehicle must yield to a pedestrian in a crosswalk unless the pedestrian suddenly leaves the curb when the vehicle is so close that it is difficult for the driver of the vehicle to yield, "but if you find that the

pedestrian did not so walk then it became the duty of the driver of the bus to yield the right-of-way to him." Defendants argue that, since there were stop signs applicable to vehicles approaching from either the east or west on Mineral street, that this was a "controlled" intersection or crosswalk at which the vehicle would have the right-of-way.

A review of the record indicates that the very instruction now objected to was, in fact, requested by the defendants. However, the record bears out the defendants' contention that such an instruction was requested only because the trial judge made it clear that an instruction of that nature would be given. Under these circumstances, where an instruction was not objected to and in fact requested, a party now complaining of the instruction on appeal has no right to have the propriety of the instruction reviewed by this court. However, in view of the reason given by the defendants for the requested instruction, which reason is undisputed, and in view of the objections to the instruction on motions after verdict, we will exercise our discretion to review the instruction, but primarily for the reason that we find no case that clearly defines the right-of-way of a pedestrian at an intersection where stop signs are posted and where the contention has been made that the intersection is a controlled one as referred to in sec. 346.24, Stats. We conclude that the reason why the matter has not previously been raised in this court is simply because the statutory mandate is clear and unequivocal that a pedestrian has the right-of-way at such an intersection.

In oral argument the defendants contended that the caption to this section, "**Crossing at uncontrolled intersection or crosswalk**," is evidence of the legislature's intent that the section shall apply at an intersection that is in any manner controlled even though that control merely consists of posted stop signs. This court has previously held that the caption of an *act* is probative

of legislative intent. *Prechel v. Monroe* (1968), 40 Wis. 2d 231, 161 N. W. 2d 373. No weight, however, is to be given to the caption to a statute inasmuch as these bold-face headings on sections and subsections of the Wisconsin statutes are prepared not by the legislature but by the revisor of statutes for the purpose of indexing and facilitating the use of the revised code of enactments. These headings are not intended to show the purpose of the legislature in enacting the law. In any event it is hornbook law that the caption or heading to a section or act, even though prepared by the legislature itself, must yield to the plain meaning of the statutory language. The statute herein provides:

"346.24 **Crossing at uncontrolled intersection or crosswalk.** (1) At an intersection or crosswalk where traffic is not controlled by traffic control signals or by a traffic officer, the operator of a vehicle shall yield the right of way to a pedestrian who is crossing the highway within a marked or unmarked crosswalk.

"(2) No pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is difficult for the operator of the vehicle to yield.

"(3) Whenever any vehicle is stopped at an intersection or crosswalk to permit a pedestrian to cross the roadway, the operator of any other vehicle approaching from the rear shall not overtake and pass such stopped vehicle."

The statute defines what is meant by an uncontrolled intersection and crosswalk. It is simply one "not controlled by traffic control signals or by a traffic officer." Applying the familiar rule of *expressio unius est exclusio alterius,* it is apparent that the legislature, by defining what it meant by controlled intersection, intended to exclude an intersection flanked only by posted stop signs. If there were any doubt of this meaning, sec. 346.25, Stats., provides:

"Every pedestrian crossing a roadway at any point other than within a marked or unmarked crosswalk shall yield the right of way to all vehicles upon the roadway."

Moreover, different rules for the pedestrian's right-of-way are specifically provided by sec. 346.23, Stats., for that section provides that, where traffic is controlled by traffic control signals or by a traffic officer, a pedestrian shall yield the right-of-way to vehicular traffic lawfully proceeding directly ahead on a green signal. This rule, of course, is qualified by the right of a pedestrian to continue if he has lawfully entered the intersection. The predecessor statute similar to sec. 346.24 was discussed in *McDonald v. Wickstrand* (1931), 206 Wis. 58, 60, 61, 238 N. W. 820. The rationale behind the legislature's enactment was discussed:

"The rapid movement and the bulk of the automobile, the thoughtlessness of some drivers, and the determination of the traveler on foot brought conflicts if not collisions which resulted in a feeling that the pedestrian, in the nature of things, ought to have a reasonable opportunity when properly upon the street at a crosswalk to reach the sidewalk. . . . This feeling eventually ripened into a public opinion that found expression in the legislation above referred to. That the respondent was where he had a right to be no one questions, and that he had the benefit of the assurance that the law required oncoming drivers to yield him the right of way is certain."

We conclude, therefore, that the instruction was properly given by the court.

It should also be noted sec. 346.24, Stats., provides that whenever any vehicle is stopped at a crosswalk to permit a pedestrian to cross, an operator of a vehicle approaching from the rear shall not overtake and pass the stopped vehicle. Although no instruction in this regard was requested and the point is therefore not controlling herein, it is apparent that this situation also existed when Louis

Turner testified that, after the car ahead of him pulled into the service station, he remained stationary, observing pedestrian and "waiting for him."

*Was the plaintiff's negligence causal*
*as a matter of law*

By its answer to question No. 3 of the special verdict, the jury found Hoeft negligent in the manner in which he crossed the street, but it found such negligence not a cause of the accident. The defendants point out that, in view of the record, there are only two aspects of negligence which could have been considered by the jury—that the plaintiff was negligent as to lookout or in his manner of entering a crosswalk at a time or in such a fashion that made it difficult for the bus driver to yield the right-of-way to him. We believe the plaintiff was correct in placing his emphasis on lookout, for, although the jury was instructed in regard to the plaintiff's duty in regard to suddenly placing himself in the path of the oncoming vehicle, we conclude from a perusal of the record that there would have been no evidence to sustain a finding that the plaintiff was negligent in his manner of entering the crosswalk. The evidence is undisputed that he was walking at a slow pace and that he made an observation to the north before stepping from the curb. We conclude, therefore, that the negligence the jury found was in regard to lookout. We agree with the jury's finding that it could properly have found such negligence not to be a cause of the accident. We have stated in *Cedarburg Light & Water Comm. v. Allis-Chalmers Mfg. Co.* (1967), 33 Wis. 2d 560, 564, 148 N. W. 2d 13, 149 N. W. 2d 661, that:

"Upon review in this court we are committed to the rule that the judgment must be upheld if there is any

credible evidence which under any reasonable view admits of an inference supporting the verdict."

We pointed out that these standards are applicable to causation as well as the presence of negligence. The test this court has adopted in determining whether negligence is causal is the "substantial factor" test. *Lee v. National League Baseball Club* (1958), 4 Wis. 2d 168, 89 N. W. 2d 811. In the case of *Pfeifer v. Standard Gateway Theater, Inc.* (1952), 262 Wis. 229, 55 N. W. 2d 29, unfortunately, neither party requested a definition of legal cause, and the trial judge failed to submit a definition in his instructions. Nevertheless, the test that is to be applied is the "substantial factor" test. We have held that only if the facts indicate that reasonable men could not differ as to whether the plaintiff's conduct was a substantial factor in producing the accident does the question of causation become one of law which a court may decide either prior to a verdict or upon appeal. *Milwaukee & Suburban Transport Corp. v. Royal Transit Co.* (1966), 29 Wis. 2d 620, 139 N. W. 2d 595. In that case, at page 629, we pointed out, citing Prosser, *Law of Torts* (2d ed.), p. 281, sec. 50:

" '. . . in cases *where reasonable men might differ—which will include all but a few of the cases* in which the issue is in dispute at all—*the question is one for the jury.*' "

We are satisfied that this is an instance in which reasonable men might differ and, for that very reason, the jury properly could have found that negligence as to lookout was not causal.

The evidence is undisputed that the plaintiff made an observation and saw the bus at a distance of half a block beyond the northern boundary of the intersection. The record does not indicate that distance in feet, but it is evident that the bus was a substantial distance north of

the intersection, which in itself was 46 feet wide. The jury could have concluded that the negligence was causal on the theory that had the pedestrian looked again he would have seen the bus approaching and have gotten out of the way. We cannot conclude, however, that that is the only reasonable conclusion that the jury could have reached. The jury could just as reasonably have concluded that the plaintiff's original and admittedly efficient observation apprised the plaintiff that the bus was at a considerable distance from him and, having the right-of-way, he reasonably could have assumed the bus was traveling at a lawful rate of speed and that he would have ample opportunity to reach the center of the street or he could reasonably have assumed that the bus driver would yield the right-of-way. Moreover, there was testimony that placed the plaintiff anywhere from within 2 feet to within 6 to 8 feet of the center line, which meant that he was completely out of the east lane, in which the bus was traveling when he first saw it. There was evidence from which the jury could conclude that the bus was traveling at a speed as high as 35 miles an hour, and the cab driver testified that the bus appeared to "shoot" from the curbline lane toward the center. If these pieces of evidence were believed, the jury could well have concluded that the plaintiff's conduct, although negligent, was not causal. This being a question upon which reasonable jurors might well differ, we cannot conclude as a matter of law that the negligence was causal, and the verdict in this respect must be sustained. The situation herein is not unlike that in *McDonald v. Wickstrand, supra,* wherein Mr. Justice EDWARD T. FAIRCHILD, speaking for the court, stated, at page 62:

". . . there appears in the record enough to warrant the jury in concluding, as it evidently did conclude, that the appellant was not near enough to the crossing at the time of respondent's last observation reasonably to require respondent to stop . . . . Respondent had a right to

proceed in the expectation that those approaching by automobile would observe the rule of law governing in such cases."

Mr. Justice FAIRCHILD pointed out that the question was one for the jury and a hindsight appraisal would not be given by this court.

*Did the trial court err in instructing the jury that it could award damages for future pain and suffering and impairment of earning capacity*

The trial court instructed the jury to insert such sum of money in the verdict as they were satisfied would fairly and reasonably compensate the plaintiff for the pain and suffering suffered to date and that he was reasonably certain to suffer in the future. The defendant argues that *Huss v. Vande Hey* (1965), 29 Wis. 2d 34, 138 N. W. 2d 192, and *Diemel v. Weirich* (1953), 264 Wis. 265, 58 N. W. 2d 651, require that there be medical testimony to support an award for a permanent injury or for future pain and suffering when the injury is subjective in nature. It should be pointed out that Hoeft's injury was not subjective in nature. It was objectively demonstrated by physical examination and X rays that satisfied Dr. Howard Johnson that there was a physical separation of the left acromioclavicular joint. On the basis of objective signs, he found a diminished strength in using the left arm above the horizontal position. Although he testified that surgery would improve stability of the joint, he concluded that there were changes in the ligaments that were irreparable. All of this testimony was to a reasonable degree a medical certainty or probability. In *Rogers v. Adams* (1963), 19 Wis. 2d 141, 146, 119 N. W. 2d 349, this court concluded that the testifying doctor's statement that, " 'I feel here is a man that has had rather marked osteoarthritis for his age; that the accident aggravated it. I feel that it has accelerated the process and probably

will in the future over what you would expect if the patient had not been in the accident,' " constituted minimal evidence sufficient to support an award for permanent injury and for future pain and suffering.

We conclude that there is more than that minimal evidence present in this case. Doctor Johnson in at least two portions of record pointed out that the plaintiff presently had pain and gave as his opinion that there would be less pain following the recommended surgery. It is clear that one could properly draw from the physician's statement the clear inference that pain would continue despite the surgery. Moreover, as stated above, the injury was not subjective and was considered to be permanent and disabling.

Much of the same testimony is applicable to the defendants' contention that there was no evidence in the record upon which the trial court could have based an instruction permitting the award of damages for future impairment of earning capacity. In quoting *Neider v. Spoehr* (1968), 39 Wis. 2d 552, 558, 159 N. W. 2d 587, the court reaffirmed the guidelines set out in *Reinke v. Woltjen* (1966), 32 Wis. 2d 653, 146 N. W. 2d 493. We stated therein:

"This court has approved the rule that where the evidence establishes the plaintiff has suffered a 'permanent injury,' this is usually sufficient to permit the jury to infer there has been a compensable impairment of earning capacity. *Reinke v. Woltjen, supra.* However, where there is affirmative evidence that there has been no impairment of earning capacity, without any evidence to the contrary, medical or otherwise, the jury should not return an award for this item." *See also Ballard v. Lumbermens Mut. Casualty Co.* (1967), 33 Wis. 2d 601, 609, 148 N. W. 2d 65.

In addition to the testimony of Dr. Johnson that there would be a residual impairment of motion and loss of strength upon elevation of the arm, he testified that there would be two weeks of hospitalization, at least six

weeks of complete immobility of the arm, and an additional period of therapy during which no work whatsoever could be performed of at least three months.

Plaintiff at the time of the trial was forty years of age and had a life expectancy of more than twenty-eight years. He had only an eighth grade education and, although at one time he worked as an auto mechanic, he has in the last fifteen years worked almost exclusively as an unskilled manual laborer. The evidence reveals that subsequent to the accident he had to quit several manual labor jobs because the work was too heavy for his weakened and painful shoulder.

The wage records show that his income in 1966 was $1,700 lower than in 1965, the year of the accident, and his income in 1967 was $2,000 lower than his 1965 earnings. Unlike the facts in the cases relied upon by the defendants, *Behringer v. State Farm Mut. Automobile Ins. Co.* (1959), 6 Wis. 2d 595, 95 N. W. 2d 249, and *Lundquist v. Western Casualty & Surety Co.* (1966), 30 Wis. 2d 159, 140 N. W. 2d 241, there was evidence herein that Hoeft's earning capacity subsequent to the accident was impaired. In the cases cited by defendants, both of the plaintiffs had returned to their jobs after the accident without any diminution in their earnings. We are satisfied that the medical evidence of the permanency of Hoeft's disability, the degree of impairment expected, the aptitude and ability of Hoeft to carry on other types of work, his age, his education, and a comparison of the compensation he received before and after the injury are sufficient for the jury to award damages for the impairment of future earning capacity.

*Did the trial court's alleged failure to properly*
*instruct jury result in a duplication of damages*

Defendants also argue that the award for wage loss and for the impairment of earning capacity are duplicitous. They point out that, in instructing the jury in

regard to the answer of loss of wages under question No. 6 (b), Judge CURLEY stated:

". . . you should allow the plaintiff as damages for his loss of earnings such sum as he was reasonably capable of earning at his usual trade or occupation during such period as he was unable to perform his usual work or carry on his usual occupation as a natural consequence of the personal injuries received at the time in question."

In connection with the award for personal injury, question No. 6 (c) of the special verdict, the judge told the jury to award damages for such impairment of earning capacity as it found to date and plaintiff was reasonably certain to suffer in the future. Defendants argue that it was error to fail to instruct the jury not to duplicate its awards in these two questions. Plaintiff, however, points out that the defendants neither requested such an instruction nor raised any objection to the lack of such instruction either during the trial or on motions after verdict. It is raised for the first time on this appeal. Defendants concede in their reply brief that the question of a duplicitous verdict was not raised until the appeal was before this court. They ask that we invoke our discretionary powers and order a new trial. Defendants concede that as a matter of right and under the rule of *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 80 N. W. 2d 380, the question cannot now be raised as a matter of right. Under our discretionary powers, this court could examine the question. We however decline to do so in view of the trial court's determination that the damages awarded were not excessive and from our own review of the record that indicates the trial judge properly exercised his discretion in upholding the jury's verdict. We have held that a damage verdict would not be disturbed when there is any credible evidence which under any reasonable view supports the jury's finding. *Bach v. Liberty Mut. Fire Ins. Co.* (1967), 36 Wis. 2d 72, 152 N. W. 2d 911. Nor will this court upset the trial judge's

order on motions after verdict unless there is an apparent abuse of discretion. *Moritz v. Allied American Mut. Fire Ins. Co.* (1965), 27 Wis. 2d 13, 133 N. W. 2d 235. The trial judge herein in his memorandum opinion carefully set forth the reasons why he considered the damage verdict to be supported by the evidence. He relied upon the testimony of Dr. Johnson. He stated, as set forth in detail above, the testimony that the injury was permanent, was disabling, and would impair the ability of the plaintiff to do work in the future. In addition, the record indicates the plaintiff suffered a contusion and abrasion of the head which caused an initial loss of consciousness and headaches which lasted for several weeks, a contusion of the left knee which resulted in disability and pain, and an injury to the left hip which resulted in stiffness, loss of mobility, and pain for a period of at least six weeks. While the defendants have argued that the plaintiff returned to work too soon and that this, coupled with his failure to have surgery promptly as recommended, resulted in an aggravation of the injury, there was no evidence that the work performed by the plaintiff aggravated the condition, nor evidence that the plaintiff's personal injuries would have been lessened and his damages mitigated had the surgery been undertaken promptly. We are satisfied from the trial judge's analysis and from our own review of the record that there was no abuse of discretion in denying the motions after verdict and in sustaining the jury's award.

*Was there error in instructions in regard*
*to speed*

Defendants also argue that the trial court erred in instructing the jury that the bus driver had a duty to reduce his speed when approaching and crossing an intersection. He argues that this court's decision in *Lundquist v. Western Casualty & Surety Co.* (1966),

30 Wis. 2d 159, 140 N. W. 2d 241, holds that a driver on an arterial highway is not required to reduce his speed in anticipation that a driver on an intersecting street fails to yield the right-of-way. The rule of *Lundquist* has no application to a situation where, as here, a pedestrian has the right-of-way at an uncontrolled intersection and where it is the driver's duty to yield. *Lundquist* is concerned with vehicular, not pedestrian, traffic.

Defendants also would find error in the trial court's instruction requiring a driver to operate his vehicle at an appropriate reduced speed when crossing an intersection when special hazards exist in regard to other traffic or highway conditions. We find no error in this instruction. Special hazards were clearly present. Vehicles were stopped within the intersection which partially blocked the defendant's side of the road. Visibility was reduced because of nighttime. There was obscured vision resulting from shadows and flickering lights from oncoming vehicles and shadows resulting from the lights of the service stations. Moreover, the presence of the pedestrian in the crosswalk was known to the bus driver before he entered the intersection from the north.

The defendants object also to the instruction in regard to nighttime driving speed—the *Lauson* rule (*Lauson v. Fond du Lac* (1909), 141 Wis. 57, 123 N. W. 629)—that one who drives a motor vehicle upon the highway in the nighttime must drive at such rate of speed as will permit him to stop within the distance he can see ahead. Defendants' position in objecting to this instruction has more validity than the other two just discussed. Nevertheless, as stated above, the driver testified that it was difficult for him to see in the area because of the flickering lights and shadows. There was sufficient evidence upon which this instruction could be based.

It should also be noted that each of these three instructions objected to by defendants are concerned with speed. Independent of whatever finding could have been

made in respect to reduced speed at an intersection, operating at a rate of speed permitting a stop within the range of vision, and speed when special hazards exist, there was also evidence, which the jury could have believed, that the bus driver was operating at a speed ten miles per hour in excess of the statutory limits set at that place. A finding of negligence as to speed is clearly supportable by the evidence.

*By the Court.*—Judgment affirmed.