Marion STEINBERG and Ralph Steinberg, Plaintiffs-Appellants-Cross Respondents,

MILLER BREWING COMPANY, Involuntary-Plaintiff-Co-Appellant-Cross Respondent,

v.

Dr. Thomas R. JENSEN, Wisconsin Health Care Liability Insurance Plan, Physicians Insurance Company of Wisconsin and Wisconsin Patients Compensation Fund, Defendants-Respondents-Cross Appellants.†

Court of Appeals

*No. 92–2475. Oral argument December 15, 1993.—Decided June 29, 1994.*

(Also reported in 519 N.W.2d 753.)

†Petition to review granted.

239

241

242

For the plaintiffs-appellants-cross respondents the cause was submitted on the briefs of *Kravit, Gass & Weber, S.C.* by *J. Ric Gass, Janice A. Rhodes* and *Marilyn M. Carroll* of Milwaukee, *Denis McNamara* of Elkhorn, and *Woehrer Law Offices* by *Mary L. Woehrer* of Wauwatosa. There was oral argument by *J. Ric Gass*.

For the defendants-respondents-cross appellants the cause was submitted on the briefs of *Schellinger & Doyle, S.C.* by *Paul J. Kelly* and *Clare T. Ryan* of Brookfield. There was oral argument by *Timothy Strattner*.

Before Wedemeyer, P.J., Sullivan and Fine, JJ.

WEDEMEYER, P.J.   Marion and Ralph Steinberg appeal from a judgment entered in a medical malpractice case after a jury found that Dr. Thomas R. Jensen was negligent, but not causally so. Dr. Jensen, Wisconsin Health Care Liability Insurance Plan, Physicians Insurance Company of Wisconsin and Wisconsin Patients Compensation Fund (defendants) cross-appeal from that part of the judgment finding that the Steinbergs' past and future damages totaled $10.8 million.

On the direct appeal, the Steinbergs raise the following issue for our consideration: Whether a pattern of informal discovery, highlighted by several *ex parte* contacts between a plaintiff's treating physicians, as fostered by the defense attorney for the defendants, violates the rule enunciated in *State ex rel. Klieger v. Alby*, 125 Wis. 2d 468, 373 N.W.2d 57 (Ct. App. 1985) and, if so, whether such violation mandates some type of sanction. We conclude that the rule enunciated in *Klieger*, which prohibits private conferences that have the potential to breach the physician-patient privilege, was violated in this case and required sanction and, therefore, we reverse and remand for a new trial.[1]

In their cross-appeal, defendants present four issues for review: (1) whether the jury award regarding future medical expenses was excessive; (2) whether the trial court erred in limiting cross-examination of the

---

[1] The Steinbergs raise two other issues for our review: (1) whether the trial court erroneously instructed the jury on the issue of causation; and (2) whether the interests of justice require a remand for a new trial. Because we have ordered a new trial due to the *Klieger* violations, it is unnecessary to resolve these issues at the present time.

plaintiffs' economist; (3) whether the jury award for past and future pain, suffering and disability was excessive; and (4) whether the jury awards to Ralph Steinberg for past and future nursing services and loss of society and companionship are excessive. Because we resolve each issue in favor of sustaining the damages award, we affirm that part of the judgment awarding the Steinbergs a total of $10.8 million.

## I. BACKGROUND

Marion Steinberg is a sixty-four-year-old woman who is permanently and severely brain damaged. Mrs. Steinberg suffered neurological injuries in August 1989, while under the medical care of Dr. Jensen. Mrs. Steinberg had initially visited Dr. Jensen in April 1989, in order to receive treatment for shingles. During the course of his physical examination, Dr. Jensen found that Mrs. Steinberg had a markedly elevated blood pressure. Over the next several months, Dr. Jensen prescribed a variety of antihypertensives in an effort to find an agent which was both effective and acceptable to Mrs. Steinberg.

On August 11, 1989, Dr. Jensen prescribed an antihypertensive drug called Maxzide. During the week following the prescription of this drug, Mrs. Steinberg called Dr. Jensen on several occasions complaining of fatigue, upset stomach, diarrhea, cramps, restlessness, absence of bowel movements and inability to urinate. On the evening of August 17, 1989, Mr. Steinberg called Dr. Jensen to inform him that his wife's condition had worsened in that she was very tired, was unable to have bowel movements or urinate and was drinking increased amounts of water.

On August 18, 1989, Dr. Jensen examined Mrs. Steinberg in his office and diagnosed a bladder disten-

sion and noted that she had most likely suffered a seizure the previous night. He performed a catheterization and obtained a large amount of urine. He then admitted her to West Allis Memorial Hospital (WAMH).

During this hospitalization, Dr. Jensen called in nine consulting physicians, three of whom were Drs. Feridoun Beroukhim, Walter K. Wong and Matthew Hanna. At all times relevant to the present lawsuit, Dr. Jensen continued as Mrs. Steinberg's attending physician.

Drs. Beroukhim and Wong, both neurologists, examined Mrs. Steinberg on August 18, 1989. Both doctors diagnosed her as having hyponatremia (a sodium deficiency) and recommended a corrective course of action. Shortly thereafter, Mrs. Steinberg suffered a second seizure and became unresponsive. She was then transferred to the intensive care unit.

The following day, Dr. Hanna, a nephrologist (kidney specialist), examined Mrs. Steinberg. By Sunday morning, August 20, Mrs. Steinberg was alert and coherent. Her sodium level was reported as being totally corrected. On Monday, however, she again became unresponsive. When she eventually awoke, she was severely brain damaged.

Following her release from WAMH on September 18, 1989, Mrs. Steinberg was treated at several other institutions, including Milwaukee County Medical Complex (MCMC), all without success in restoring lost brain function. Mrs. Steinberg eventually returned home to be in the care of her family members.

On January 2, 1991, the Steinbergs filed a lawsuit against Dr. Jensen and his insurers for negligence by medical malpractice. During the ensuing discovery, the Steinbergs deposed Dr. Jensen and learned that while

he was Mrs. Steinberg's attending physician, he had consulted with Drs. Beroukhim, Wong and Hanna concerning the appropriate treatment necessary for Mrs. Steinberg's condition. The Steinbergs subsequently deposed the three consulting doctors. The depositions revealed that, following the initiation of the lawsuit, several informal communications had occurred between the consulting doctors, Dr. Jensen and defense counsel.

Specifically, the depositions of Drs. Beroukhim and Wong disclosed that Dr. Jensen had been instructed by his defense counsel to discuss Mrs. Steinberg's case with them prior to their depositions. As noted in Dr. Beroukhim's deposition:

> Oh, I have to mention that [Dr. Jensen] also — I think the core of discussion — the reason he came here was the fact that he said that his attorney, Mr. Kelly, had requested him to talk to us. He wants to talk to us regarding this case, and he asked him to talk to us prior to that.

Consequently, Dr. Jensen called both Drs. Beroukhim and Wong and arranged for the three of them to meet and discuss the case.

The meeting apparently lasted between thirty-to-forty minutes. Dr. Jensen explained that Drs. Beroukhim and Wong might become named parties in the lawsuit. During the conversation, the following topics relating to Mrs. Steinberg's condition were discussed: appropriateness of the overall treatment; relationship of the sodium replacement and neurological impairment; the patient's reaction to medication and the replacement of electrolytes during treatment. Dr. Wong testified that Dr. Jensen informed him that the care given Mrs. Steinberg was appropriate and that Dr.

247

Jensen saw no reason for the lawsuit. Dr. Jensen further informed Dr. Wong that there was insufficient evidence to prove the Steinbergs' allegation that Mrs. Steinberg was afflicted with Central Pontine Myelinolysis (CPM).[2]

Following this informal meeting, Drs. Beroukhim and Wong reviewed Mrs. Steinberg's medical records from MCMC, as well as the transcript of Dr. Jensen's deposition. Dr. Jensen's attorney had provided these materials to counsel for both Drs. Beroukhim and Wong. There is no dispute that Drs. Beroukhim and Wong had no involvement with the care of Mrs. Steinberg while she was being treated at MCMC. Dr. Beroukhim also noted that, as a direct impetus of the informal discussions between the other doctors, in an effort to be better prepared for his ensuing deposition, he performed outside research including a MEDLINE search.[3]

Prior to Dr. Hanna's deposition on August 7, 1991, counsel for Dr. Jensen furnished him with Mrs. Steinberg's complete medical records from WAMH. During the course of his deposition, Dr. Hanna denied ever

---

[2] Central Pontine Myelinolysis, associated with osmotic demyelination syndrome, is the neurological deterioration that occurs after rapid correction of hyponatremia. As serum sodium is increased, water flows out of the brain. The brain becomes dehydrated and cells that produce myelin, which insulate brain cells, are destroyed. Neurological condition initially improves, but after a few days demyelinating lesions develop in the central pons and brain function is decreased. RUSSELL L. CECIL, TEXTBOOK OF MEDICINE 2127 (James B. Wyngaarden, Lloyd H. Smith, Jr. & J. Claude Bennett eds., 19th ed. 1992).

[3] MEDLINE is an electronic database, the medical equivalent to WESTLAW or LEXIS, and is a rapid means of locating relevant and timely articles relating to issues in the medical field.

speaking to Dr. Jensen or Dr. Jensen's counsel. Dr. Hanna's counsel objected to any questions directed to the doctor that required him to elicit opinion testimony concerning Mrs. Steinberg's injuries and the treatment thereof. The deposition revealed that Dr. Hanna had examined Mrs. Steinberg only on August 19 and 20, 1990, while she was hospitalized at WAMH. Shortly after his deposition, Dr. Hanna volunteered to be an expert witness on behalf of Dr. Jensen.

On September 1, 1991, as a result of the revelation about the *ex parte* contacts between the treating physicians, the Steinbergs amended their complaint to include a punitive damage claim for denial of their right to a fair trial due to the potential breaches of confidentiality by Mrs. Steinberg's treating physicians.[4] On February 10, 1992, the trial court granted a motion by the defendants to dismiss the breach of confidentiality claim. Although it granted the defendants' request to dismiss the claim, the trial court nonetheless recognized that there might be a problem concerning the *ex parte* contacts:

> [W]hile I'm not going to decide at this particular moment whether Dr. Jensen's conduct in contacting these doctors was appropriate or inappropriate it may be that it merits some type of sanction and

---

[4] The parties acknowledge that a cause of action seeking punitive damages for denial of a party's right to a fair trial due to physician-patient breaches of confidentiality is not presently recognized in Wisconsin. Without passing judgment on the merits of creating such a cause of action, we note that this issue is more appropriately addressed to the supreme court. *See State v. Mosley*, 102 Wis. 2d 636, 665-66, 307 N.W.2d 200, 216-17 (1981) (request that the court of appeals adopt a new rule or doctrine falls into the category of statewide development of the law, a task relegated to the supreme court).

some other kind of remedy under our discovery laws and since I have not been asked to do that today I'm not going to do it.

During the course of the argument on the motion, Dr. Jensen's counsel denied that a violation of the rule set forth in *Klieger* had occurred. As paraphrased by his counsel, all Dr. Jensen did was go to Drs. Beroukhim and Wong and say "Hey I'm being sued, and you might be too," which is of course, not a *Klieger* violation. Defense counsel also told the trial court "that neither Dr. Jensen nor I have had any communication with any one other than Dr[s]. Beroukhim or Wong."[5]

The trial court subsequently ordered Dr. Jensen's counsel to provide the Steinbergs' counsel with a summary of the issues that each defense expert witness was expected to address at trial. By letter dated February 19, 1992, Dr. Jensen's counsel responded to the order listing six defense medical experts with a brief summary of their proposed testimony. Dr. Hanna was not on the witness list.

On January 25, 1992, the Steinbergs served discovery requests on Dr. Jensen to determine the extent of any *ex parte* communications that might have occurred between him and Drs. Beroukhim, Wong and Hanna. The defense responded on March 26, 1992, that there had been no *ex parte* communications among the doctors other than Dr. Jensen's informal meeting with Drs. Beroukhim and Wong.

The Steinbergs then moved for sanctions because of the *ex parte* contacts between Drs. Jensen, Ber-

---

[5] In fact, as mentioned above, Drs. Hanna and Jensen conversed on August 19, 1991, shortly after Dr. Hanna's deposition. This is not to imply that defense counsel lied to the trial court — Dr. Jensen may have simply neglected to mention this fact to his counsel.

oukhim and Wong and the *ex parte* disclosures by Dr. Jensen to Drs. Beroukhim, Wong and Hanna. Specifically, the Steinbergs sought an order preventing the three physicians from rendering opinions whether Dr. Jensen met the standard of care in treating Mrs. Steinberg. They did not, however, ask that the physicians be precluded from testifying as to what treatment or advice they rendered during the time in which they cared for Mrs. Steinberg. The trial court denied the motion. In sum, it reasoned that because the meetings were between Drs. Jensen, Beroukhim, Wong and Hanna and not with Dr. Jensen's lawyer, because the conversations were casual and not substantive, and because the records provided to the doctors were records they were entitled to see, no *Klieger* violation occurred.[6]

---

[6] In denying the motion for sanctions, the trial court made the following remarks:

> First of all, with regard to the *State ex rel. Klieger v. Alby* case at 125 Wis. 2d 468 I do not see this case falling under that particular gamut. I think it's distinguishable primarily because on page 469 of that case it states, "The sole issue on this appeal is whether Wisconsin law prohibits a defendant's attorney from conducting private pretrial interviews with the plaintiff's treating physician." And that is not what happened here.
>
> I think that this case is driven by the rather unique facts and that we need to make a distinction between casual or related conversations between doctors and conversations and interviews dealing with medical testimony by the attorney. . . .
>
> So, first of all, I think that the *Alby* case was directed at a defendant's attorney and I am satisfied in this case that at least on the basis of what I have seen, this is not a situation where Mr. Kelly or any one on his behalf has sat down and talked to the current treating physicians as to what's gone on and gotten information from them that they wouldn't ordinarily be entitled to. I think this is a situation where the doctor who is being sued communicated to the other doctors that he was being sued, a violation of nothing, just casual conversation, and at that point they then decided to get their own counsel and I guess became a little paranoid themselves

At trial, the Steinbergs read in the deposition of Dr. Hanna as the treating nephrologist. Dr. Jensen subsequently called Dr. Hanna as an expert, although not listed as an expert as required by the trial court's order of February 20, 1992. Dr. Hanna's direct examination testimony revealed that after he had been deposed on August 7, 1992, by the Steinbergs, he spoke with Dr. Jensen on August 19, 1992, when he volunteered to testify for Dr. Jensen. Dr. Hanna revealed that three days before he testified on Dr. Jensen's behalf, he had spoken on the telephone with Dr. Jensen and his lawyer concerning the treatment that he had rendered on behalf of Mrs. Steinberg. Dr. Hanna also revealed that he had reviewed Dr. Jensen's deposition and office records prior to his testifying at trial. After these direct examination revelations, the Steinbergs

and wanted to review all the records so I don't think that it violates *Alby*.

The trial court also stated:

> Now, my understanding, although somewhat dated, is that medical records in that department — that a doctor whose [sic] been involved has access to the previous records, both that he wrote as well as those that may surround it. I don't believe that the medical records area of any hospital is so exclusive as to only give the doctor the one tiny little part that he may have written in an entire medical report. I think that once he is a treating physician he is or she is entitled to the entire record as it then existed; and I think that's what we have here.
>
> Perhaps the better practice so that plaintiff's counsel will not be taken by surprise is to alert them that the entire record has been retrieved and has been shown to this doctor; but I certainly don't think that it's improper for a doctor who is concerned that he may be sued himself to go back and review a case and see what he did and see what other people did. I would have to agree with Mr. Kelly that information is power with regard to that and it would be wrong to blindfold a doctor and not let him know what happened since none of us have perfect memories when he is going to be asked to give a deposition.

moved to strike Dr. Hanna's testimony. The trial court did not immediately rule on the motion but, over objections, instructed the Steinbergs' counsel to continue the cross-examination. Shortly thereafter, the trial court ruled that the telephone conference violated the *Klieger* rule, as extended by *Zintek v. Perchik*, 163 Wis. 2d 439, 471 N.W.2d 522 (Ct. App. 1991), but stated: "I'm a little perplexed as to what the appropriate sanctions should be, if any, for this court." The trial court imposed no sanction for the violation.

## II. STEINBERGS' APPEAL

A trial court's decision on evidentiary matters is within its broad discretionary authority, and its rulings will not be reversed on appeal if it has a reasonable basis and was made in accord with accepted legal standards and in accord with the facts of record. *Wikrent v. Toys "R" Us, Inc.*, 179 Wis. 2d 297, 306, 507 N.W.2d 130, 133 (Ct. App. 1993).

> Discretion[, however,] is not synonymous with decision making. Rather, the term contemplates a process of reasoning. This process must depend upon facts that are of record or that are reasonably derived by inference from the record and a conclusion based on logical rationale founded upon proper legal standards. A decision which on its face demonstrates no consideration of any of the factors upon which the decision should be properly based constitutes an [erroneous exercise] of discretion as a matter of law.

*State v. Outlaw*, 104 Wis. 2d 231, 244, 311 N.W.2d 235, 241 (Ct. App. 1981) (citations omitted).

This appeal invites a further examination of the rule enunciated in *State ex rel. Klieger v. Alby*, 125 Wis. 2d 468, 373 N.W.2d 57 (Ct. App. 1985). In *Klieger* , this court declared that the statutory physician-patient privilege is not totally waived with the "commencement of a lawsuit so as to allow informal conferences with treating physicians, unless the privilege is lost due to unrelated exceptions." *Id.* at 473, 373 N.W.2d at 60 (footnote omitted). We further ruled that the limited waiver of the physician-patient privilege as contained in § 905.04(4)(c), STATS., is restricted to communications relevant to or within the scope of discovery, the methods of which are set forth in § 804.01(1), STATS., and does not include "informal, *ex parte* conferences". *Id.*[7] Thus, we concluded that the filing of a medical

[7] The physician-patient privilege is statutorily based and reads as follows:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental or emotional condition, among the patient, [and] the patient's physician . . . .

Section 905.04(2), STATS. The patient has the right to claim the privilege and "[t]he authority so to do is presumed in the absence of evidence to the contrary." Section 905.04(3), STATS. Consequently, only the patient may waive or authorize another person to waive the physician-patient privilege that he or she maintains pursuant to § 905.04(2).

The legislature, in drafting the physician-patient privilege, recognized that certain exceptions to the privilege are appropriate. Presently there are ten exceptions. *See* § 905.04(4)(a)-(i), STATS. The exception at issue in the present case is § 905.04(4) (c), STATS., which reads:

> *Condition an element of claim or defense.* There is no privilege under this section as to communications relevant to or within the scope of discovery examination of an issue of the physical, mental

malpractice action "does not automatically waive the physician-patient privilege so as to permit a court to order an informal conference over plaintiff's objections." *Id.* at 474, 373 N.W.2d at 60. The rationale for the rule is that the privilege belongs solely to the patient, and only the patient may dictate the extent of any waiver he or she may deem appropriate. To rule otherwise would be tantamount to restricting the

or emotional condition of a patient in any proceedings in which the patient relies upon the condition as an element of the patient's claim or defense, or, after the patient's death, in any proceeding in which any party relies upon the condition as an element of the party's claim or defense.

The general provisions governing discovery are set forth in chapter 804 of the statutes and provide in pertinent part:

(1) DISCOVERY METHODS. Parties may obtain discovery by one or more of the following methods: depositions upon oral examination or written questions; written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other purposes; physical and mental examinations; and requests for admission. Unless the court orders otherwise under sub. (3), the frequency of use of these methods is not limited.

(2) SCOPE OF DISCOVERY. Unless otherwise limited by order of the court in accordance with the provisions of this chapter, the scope of discovery is as follows:

(a) *In general.* Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Section 804.01(1) and (2)(a), STATS. (Emphasis added).

patient's control of the privilege. *Id.* at 474, 373 N.W.2d at 61.

To date, three cases have wrangled with the application of *Klieger*: *Haack v. Temple*, 150 Wis. 2d 709, 442 N.W.2d 522 (Ct. App. 1989); *Zintek v. Perchik*, 163 Wis. 2d 439, 471 N.W.2d 522 (Ct. App. 1991); and *Wikrent v. Toys "R" Us, Inc.*, 179 Wis. 2d 297, 507 N.W.2d 130 (Ct. App. 1993).

In *Haack*, a treating physician arrived early for a deposition and was instructed on the mechanics of a deposition by opposing counsel. *Haack*, 150 Wis. 2d at 718, 442 N.W.2d at 526. Opposing counsel also told the physician that he could look through the medical records so that he could testify truthfully. *Id.* After first recognizing that "[a]mong the private conversations disallowed by *Klieger* are those which relate to the substance of a medical case, i.e., hospital records, treatment records, and physician opinions and insights," we concluded that *Klieger* does not forbid conversations when counsel merely explains to the physician the mechanics of a deposition. *Id.*

In *Zintek*, we rejected an attempt by a party-physician to compel the plaintiff to authorize *ex parte* contacts with the treating physician regarding the patient's "care at the hands of the defendants and other physicians." *Zintek*, 163 Wis. 2d at 469, 471 N.W.2d at 534 (italics omitted). Because the patient controls the privilege, and because such a rule modification "so trammels, undetected, a plaintiff's exercise of his or her privilege," we refused to allow trial court's to compel plaintiffs to submit to such informal discovery. *Id.* at 469, 471 N.W.2d at 534.

Finally, and most recently in *Wikrent*, 179 Wis. 2d at 307, 507 N.W.2d at 134, when considering an appropriate sanction for a *Klieger* violation, we adopted the

analysis of *Karsten v. McCray*, 509 N.E.2d 1376, 1384 (Ill. Ct. App. 1987), and held that "exclusion of the testimony of a party's physician is an appropriate remedy when there are *ex parte* substantive discussions with that physician by an opposing party." We recognized that the judicial policy set forth in *Klieger* prevents attempts at shortcutting through procedural and evidentiary rules. *See id.* at 304-05, 507 N.W.2d at 133. These rules are clearly set forth in the statutes and are to be followed by litigants, lawyers and judges alike.[8]

In *Wikrent*, we placed increased emphasis on the importance of the patient's power to protect and control the privilege. As previously noted, we relied on the Illinois case of *Karsten*, which in turn relied on the strong public policy rationale enunciated in *Petrillo v. Syntex Labs., Inc.*, 499 N.E.2d 952 (Ill. App. Ct. 1986), *cert. denied*, 483 U.S. 1007 (1987). *Petrillo's* public policy rationale is two-fold and is based on preserving the confidential relationship, as well as the fiduciary relationship existing between a physician and client.[9] So

---

[8] In the present case, the trial court did not consider the *Wikrent* decision because it had not yet been decided.

[9] The *Petrillo* court carefully explained why it is that the public policy favoring physician-patient confidentiality and the fiduciary nature of the physician-patient relationship justifies the prohibition against *ex parte* communications. The court first recognized that the code of ethics which governs the conduct of the medical profession clearly underscores the highly confidential nature of the physician-patient relationship. *Petrillo*, 499 N.E.2d at 957. In this regard, the court alluded to the Hippocratic Oath, the American Medical Association's Principles of Medical Ethics and the Current Opinions of the Judicial Council of the American Medical Association for support. *Id.* at 957-58. The court next noted that the fiduciary relationship which exists between the patient and the physician

sacrosanct do the Illinois courts regard this privileged relationship that "[p]rejudice and improper conduct can be implied from the fact that the plaintiff's treating physician has violated his ethical and fiduciary obligations owed to his patient by engaging in *ex parte* conferences concerning the patient with the patient's legal adversary, and without the patient's consent." *Yates v. El-Deiry*, 513 N.E.2d 519, 523 (Ill. Ct. App. 1987). We are similarly persuaded, and expressly adopt the rationale of *Petrillo*.

---

serves as a basis for the expectation that the physician will provide the medical information sought by the patient's adversary pursuant only to court authorized methods of discovery. *Id.* at 961.

> Discussion of the patient's confidences under any other circumstances, such as the ex parte conference, could be inconsistent with the duties of a fiduciary for the physician would, in effect, engage in conduct which may be contrary to a fiduciary's obligation of good faith and, in addition, may be potentially harmful to the interests of the patient in that the physician might disclose intimate facts of the patient which are unrelated and irrelevant to the mental or physical condition placed at issue in the lawsuit. Consequently, the ex parte conference involves conduct which could be violative of the duties of a fiduciary and would, therefore, be contrary to the public policy favoring the fiduciary nature of the physician-patient relationship.

*Id.* at 961-62 (footnote omitted). *Accord Yates v. El-Deiry*, 513 N.E.2d 519, 522 (Ill. Ct. App. 1987) (citations omitted) ("The nature of this relationship flows not from the physician's ethical duties, but from his [or her] unique role in society. That is, when a patient comes to a doctor for medical assistance, the patient places a trust and confidence in the doctor to act in his [or her] best interest. The physician, in turn, owes a duty of good faith toward his [or her] patient.").

## A. Medical Records Dissemination

In the instant case, the trial court determined that Drs. Wong, Beroukhim and Hanna were given records that they were entitled to review. Neither party disputes that these doctors treated Mrs. Steinberg during her WAMH stay in August 1989. Dr. Jensen argues that as Mrs. Steinberg's health care providers, the three physicians not only had a right, but a duty to review all of her records, there being no legal prohibition to a treating physician's review of a patient's medical records. He therefore argues that providing Mrs. Steinberg's medical records to the treating physicians prior to their deposition in no way breached the physician-patient privilege. The Steinbergs, on the other hand, assert that Drs. Beroukhim and Wong were not entitled to view any of the MCMC records and, similarly, Dr. Hanna was not entitled to view Dr. Jensen's complete office records. The Steinbergs argue that by giving the above records to Drs. Beroukhim, Wong and Hanna, Dr. Jensen violated chapter 146, STATS., and *Klieger*.

Section 146.82(1), STATS., sets forth the general rule in Wisconsin concerning the confidentiality of a patient's health care records. In relevant part, § 146.82(1) states: "All patient health care records shall remain confidential. Patient health care records may be released only to the persons designated in this section or to other persons with the informed consent of the patient or of a person authorized by the patient." Section 146.82(2)(a)1-15, STATS., sets forth the circumstances when access to the records does not necessitate informed consent by the patient.[10]

---

[10] These circumstances can be summarized as follows: (1) for audits, accreditation; (2) to persons involved in care and

Section 804.10(2), STATS., concerning discovery procedure, provides that the trial court may order a claimant to give his or her consent and the right to inspect and copy hospital, medical or other records and reports "concerning the injuries claimed and the treatment thereof."[11] This exception to the physician-patient privilege, however, does not imply the right to freely disseminate all prior and subsequent medical care records of the patient-claimant. *See Ambrose v. General Cas. Co. of Wisconsin*, 156 Wis. 2d 306, 315, 456 N.W.2d 642, 646 (Ct. App. 1990). On the contrary, the statute specifically states that only the records and reports *relating to the injury and treatment at issue* may be ordered disclosed. In *Ambrose*, this court concluded that a trial court could order a claimant to consent to disclose health care records and reports of treatments and medical conditions prior to the claimed injury where two conditions were met. *Id.* at 315, 456 N.W.2d at 646. "First, the requester makes a showing that the health care records and reports sought are reasonably calculated to lead to the discovery of admissible evidence. *See* sec. 804.01(2)(a). Second, the

under supervision of a health care provider; (3) for billing purposes; (4) under court order; (5) in response to government agency requests; (6) for research study; (7) to county agencies per § 46.90, STATS.; (8) to DHSS under § 46.73, STATS.; (9) to protection and advocacy agencies; (10) former medical malpractice panel; (11) to county departments regarding child abuse; (12) school districts; (13) § 940.22, STATS.; (14) the aging board; and (15) death investigations.

[11] The same result may be achieved by stipulation as set forth in § 804.10(3)(b), STATS.: "This subsection applies to examinations made by agreement of the parties, unless the agreement expressly provides otherwise."

claimant is given an opportunity to assert his or her physician-patient privilege, subject to sec. 905.04(4)(c), Stats." *Id.* at 315-16, 456 N.W.2d at 646 (footnote omitted). While recognizing that under some circumstances the physician-patient privilege must fall, nonetheless, it falls only after careful consideration by the trial court.[12]

Finally, § 905.04(4)(c), STATS., relating to evidentiary matters, recognizes that "[t]here is no privilege under this section [physician-patient privilege] as to communications relevant to or within the scope of discovery examination of an issue of the physical, mental or emotional condition of a patient in any proceedings in which the patient relies upon the condition as an element of the patient's claim or defense." Consequently, in *Ambrose*, we recognized that in light of § 905.04(4)(c), one need not make a showing that the health care records and reports sought are reasonably calculated to lead to the discovery of admissible evidence "where the requested health care records and reports concern the injuries claimed and the treatment thereof." *Id.* at 315 n.6, 456 N.W.2d at 646 n.6.

Here, a search of the voluminous record reveals no medical authorization given to Dr. Jensen by the Steinbergs. However, this court recognizes that medical authorizations in cases of this nature are routinely granted in an effort to permit records encompassed by the authorization to be disclosed to experts retained by

---

[12] This assumes, of course, that there is a dispute as to what records should be properly disseminated. If the parties voluntarily agree to disclosure of the health care records at issue, then the trial court will not become involved. Full and free disclosure of all those records relating to the injury claimed and the treatment thereof is a practice that this court condones as fostering judicial efficiency.

the defendant. Thus, for purposes of this appeal, we assume that the records concerning the injuries claimed and the treatment thereof were obtained by the defendants through voluntary disclosure on the part of the Steinbergs pursuant to the discovery procedures of § 804.10(2).[13] Consequently, as to the records concerning the injuries claimed and the treatment thereof, Mrs. Steinberg lost her physician-patient privilege. Once the privilege was lost, so too was the cloak of confidentiality derived from § 146.82(1), STATS.

As potential defense experts, Drs. Beroukhim, Wong and Hanna, pursuant to the statutory mandates, were entitled to see all of the records pertaining to Mrs. Steinberg's claimed injuries and the subsequent treatment thereof. We decline the Steinbergs' invitation to extend the principles of *Klieger* to the dissemination of health care records. *See contra Lewis v. Illinois Cent. R.R. Co.,* 600 N.E.2d 504, 511 (Ill. Ct. App. 1992) (extending the *Petrillo* oral prohibition of *ex parte* communications to records kept by the physician or by a

---

[13] There is, however, a caveat to this assumption. The Steinbergs note that a portion of Mrs. Steinberg's health care records from WAMH definitely were not voluntarily disclosed to the defendants. Apparently, in June of 1991, some six months after the filing of the lawsuit, Dr. Jensen removed certain radiographs from WAMH without the informed consent of the Steinbergs. Dr. Jensen subsequently delivered these records to his attorney. This *ex parte* removal of the record clearly violated the discovery procedures as set forth in the statutes and as explicated by *Ambrose*. Consequently, Dr. Jensen was *potentially* liable in an action under § 146.84(1)(b), STATS. Unclear at this point is whether the improperly removed health care records were subject to the physician-patient privilege or whether they were discoverable pursuant to § 804.10(2), STATS. This is an issue that must be resolved by the trial court.

hospital concerning a patient's treatment). Consequently, all of Mrs. Steinberg's health care records, whether generated at WAMH, MCMC or any other treatment facility, if *properly* obtained by Dr. Jensen either through voluntary disclosure or appropriate discovery channels, could have then been appropriately disseminated to Drs. Beroukhim, Wong and Hanna.

## B. Informal Meeting

When Dr. Jensen, at the subtle urging of his counsel, caused a thirty-to-forty-minute meeting to be held with Drs. Beroukhim and Wong, the physician-patient privilege was clearly placed in jeopardy. It is evident from the record that the meeting was not a coincidental perfunctory occasion. Thus, it cannot be said to fall in the category of *Haack*, where defense counsel simply advised the treating physician on the nuances of deposition procedure. *Haack*, 150 Wis. 2d at 718, 442 N.W.2d at 526. Rather, the meeting had an agenda of substantive importance. Discussion was had concerning the efficacy of treatment rendered, the plausibility of Mrs. Steinberg's suffering from CPM and the current posture of the lawsuit against Dr. Jensen.

Granted, it might very well be the case that no inappropriate disclosures concerning the care of Mrs. Steinberg were revealed. This is, in fact, the theory Dr. Jensen's counsel successfully argued to the trial court — "The meeting was harmless, nothing inappropriate was disclosed." The complete record of what transpired during the meeting will simply never be known. That is precisely the problem with these types of *ex parte* communications. They create an honor system which relinquishes the ability of the patient-claimant to control the physician-patient privilege. We conclude that

Dr. Jensen, as Mrs. Steinberg's attending physician, by entertaining this informal meeting, breached the confidential and fiduciary relationship that existed between them and ought to be kept inviolate by § 905.04(2), STATS.

### C. *Ex Parte Communication with Dr. Hanna*

One additional incident involving the potential application of the physician-patient privilege came to light during the course of the trial when Dr. Jensen, during his defense-in-chief, called Dr. Hanna as an expert. On direct examination it was revealed that Dr. Jensen and his counsel had ' called Dr. Hanna and conversed with him about his proposed testimony.

Dr. Jensen asserts that the Steinbergs have no basis to assert a *Klieger* violation relating to this telephone conversation because, before the trial court could respond to their motion to exclude the testimony of Dr. Hanna, their counsel withdrew the motion for tactical reasons. This, they argue, constitutes waiver of the request for sanctions. We disagree.

After Dr. Jensen's direct examination of Dr. Hanna as his expert witness, the Steinbergs moved to exclude all of Dr. Hanna's testimony. The trial court indicated that it needed time to review the case law relating to the issue raised and asked the Steinbergs' counsel to begin his cross-examination on a different subject which, in fact, occurred. During a recess, the trial court invited additional argument concerning the issue. The Steinbergs' counsel withdrew his motion for the exclusion of Dr. Hanna's testimony, but asked the trial court to levy sanctions against Dr. Jensen's trial counsel for the *Klieger* violation. The trial court revisited the entire issue of whether the three-way

telephone conversation prior to trial violated *Klieger*; decided it had, but voiced perplexity as to the ramifications and left the issue of sanctions unresolved. We are not persuaded that the Steinbergs waived their right to determine on appeal whether the telephone conversation violated *Klieger*.[14] As to the substance of the claim, there is little doubt, as the trial court recognized, that the telephone conversation was a violation of *Klieger*. Dr. Hanna, as Mrs. Steinberg's physician, potentially had privileged information relating to Mrs. Steinberg that she was never given the opportunity to keep from being exposed. Again, whether confidential information was actually disclosed is irrelevant, the concern recognized by *Klieger* is the *potential* for privileged information to be disclosed. Thus, the trial court should have imposed some type of limitation on the testimony of Dr. Hanna.

In our analysis of the issue at hand, we are very much aware of the importance of intra-disciplinary communication during the period of treatment. This type of communication serves as a way of brainstorming ideas in an effort to provide the best care for a patient. These communications may take the form of specific consults with other physicians or with more informal group discussions during grand rounds and the like. These communications are of course condoned and present no violation of the physician-patient privilege. When, however, litigation has been commenced regarding the nature and quality of a patient's past treatment, the outer limits of intra-disciplinary com-

[14] Dr. Jensen, as respondent, does not contend that the trial court erroneously exercised its discretion in ruling that the Dr. Jensen-counsel-Dr. Hanna telephone conversation was a *Klieger* violation; undoubtedly, because no sanction was imposed.

munication have been reached, and compliance with the privilege must be observed. Once litigation is initiated, to allow treating physicians to be the sole judge of when and where they may communicate or disseminate information about their past or present patients, would render the rules of discovery and the physician-patient privilege meaningless.[15]

## III. DR. JENSEN'S CROSS-APPEAL

In its cross-appeal, the defendants take issue with several aspects of the award of damages rendered by the jury. Despite its determinations as to the negligence of the parties, the jury was asked to answer five questions as to the appropriate amount of compensation for the various injuries suffered by the Steinbergs. The Special Verdict as answered by the jury reads:

(A) Ralph and Marion Steinberg for medical expenses:

| | |
|---|---|
| (1) Past medical expenses | ANSWERED BY THE COURT |
| (2) Future medical expenses | ANSWER: $4 million |

(B) Marion and Ralph Steinberg for pain, suffering, disfigurement, of enjoyment of life and disability:

| | |
|---|---|
| (1) In the past | ANSWER: $1 million |
| (2) In the future | ANSWER: $2 million |

---

[15] As an additional note, we feel compelled to point out that the *Klieger* doctrine, as extended by our decision today, incorporates no hidden tricks or traps for the unwary. Simply put, unless express prior consent has been obtained from the plaintiff, the defense should not make any direct or indirect *ex parte* communications with the plaintiff's medical providers. Any discussions between defense counsel and plaintiff's medical providers must take place pursuant to formal discovery rules.

(C) Ralph Steinberg for:

    (1) Past and future nursing        ANSWER: $750,000
        services

    (2) Loss of society and           ANSWER: $3 million
        companionship of his wife

## A. *Future Medical Expenses*

The defendants first argue that the jury's award of $4 million for future medical expenses is excessive because it is based on conclusory claims rather than credible evidence.

In *Zintek*, this court set forth the standard upon which jury damage awards are reviewed:

> The amount of damages awarded is a matter resting largely in the jury's discretion. The amount of damages is for the jury to decide, and where the trial court has approved a damage award over a claim of excessiveness, the issue on appeal is whether "there is any credible evidence that under any reasonable view supports the verdict and removes the issue from the realm of conjecture."

*Zintek*, 163 Wis. 2d at 480, 471 N.W.2d at 538 (citations omitted). *See also Carl v. Spickler Enterprises, Ltd.*, 165 Wis. 2d 611, 625, 478 N.W.2d 48, 54 (Ct. App. 1991) ("The amount of damages awarded is largely within the discretion of the jury."). However, as noted by the defendants, "[e]xtraordinarily large damage awards cannot be supported by conclusory claims for damages." *Zinda v. Louisiana-Pacific Corp.*, 140 Wis. 2d 277, 291, 409 N.W.2d 436, 442 (Ct. App. 1987), *aff'd in part and rev'd in part on other grounds,* 149 Wis. 2d 913, 440 N.W.2d 548 (1989).

As an initial matter, we note that a reviewing court may review the evidentiary record as a matter of first impression where the trial court has not analyzed the evidence upon which it approved the award. *See Koele v. Radue*, 81 Wis. 2d 583, 587, 260 N.W.2d 766, 767-68 (1978). Here, the trial court was not requested to consider the issues relating to the damage award in a post-verdict motion. Consequently, the damage award was simply approved by the trial court through the entering of the judgment on August 19, 1992.

The testimony in regard to the future medical expenses of the Steinbergs was extensive. The Steinbergs called Dr. Henry Alba, a board certified specialist in physical medicine and rehabilitation, as an expert witness on the issue of future medical expenses. Dr. Alba initially explained that his goal for any of his patients is to see that they become integrated, to the extent feasible, back into the mainstream of society. To achieve these ends, Dr. Alba testified that he coordinates a rehabilitation team of physical therapists, occupational therapists, speech therapists, chaplains, social workers, psychologists, neuropsychologists, rehabilitation nurses and vocational counselors. Dr. Alba next testified that he performed a series of mental as well as physical examinations on Mrs. Steinberg. He noted that she was extremely combative and showed signs of a diffuse cerebral injury. He further explained that he believed Mrs. Steinberg's condition would be permanent, but that it would have no effect on her normal life expectancy which he projected to be eighty-two years.

As to the various expenses relating to Mrs. Steinberg's future care, Dr. Alba was very specific. He stated that Mrs. Steinberg would need: a psychiatric hospital-

ization once every three years at a cost of $3,000; a thirty-day visit to a rehabilitation hospital at a cost of $22,500; annual visits to various specialist physicians; twenty-four-hour-a-day care from a registered psychiatric nurse at an annual cost of $251,846; various training with physical, occupational and speech therapists; help with housekeeping and homemaking at an annual cost of $4,160; various medical equipment and supplies including prescription drugs; and transportation expenses. Dr. Alba testified that the aggregate sum for Mrs. Steinberg's medical care would be $261,691 per year over the next twenty years (her life expectancy).

Not only did Dr. Alba give a complete litany of the future expenses for Mrs. Steinberg, but he also explained the relevance of each in detail. These numbers were not simply created from thin air; rather, they were substantiated by a certified physical medicine and rehabilitation physician who has seen many hundreds of similarly situated patients. Further, the defendants proffered no expert testimony to establish future medical expenses in differing amounts. Consequently, we conclude that the sum awarded by the jury, which was less than that claimed by Mrs. Steinberg, was supported by credible evidence in the record, was not the product of conclusory claims and, therefore, must be sustained.

### B. Limitation of Cross-Examination

The defendants next assert that the trial court erred by limiting the cross-examination testimony of James Geffert, the Steinbergs' economist, in regard to alternative calculations of the present value of future losses.

It is within the trial court's discretion to determine the appropriate scope of cross-examination. *Peissig v. Wisconsin Gas Co.*, 155 Wis. 2d 686, 702, 456 N.W.2d 348, 355 (1990). A reviewing court will not reverse unless it clearly appears that the trial court erroneously exercised its discretion and the error complained of affected a substantial right of the party and probably affected the outcome of the trial. *Id.* A proper exercise of discretion contemplates that the decision is based on the facts of record, a correct application of the law, and is supported by a demonstrated process of legal reasoning. *Franzen v. Children's Hosp. of Wisconsin, Inc.*, 169 Wis. 2d 366, 376, 485 N.W.2d 603, 606 (Ct. App. 1992).

Geffert was called to testify on behalf of the Steinbergs in an effort to provide an economic basis for the future medical costs as projected by Dr. Alba. Specifically, Geffert proffered his calculations as to the present value of Mrs. Steinberg's total future medical expenses. Geffert concluded that a sum of $6,812,378 would be the correct present amount to provide the level of future medical care as explained by Dr. Alba. On cross-examination, counsel for the defense pointed out that, depending on the choice of numerical values assigned to variables such as discount range, rate of health care cost increase and the Consumer Price Index figures, two economists may have completely different calculations for a particular client's projected future medical expenses. Defense counsel, however, was not allowed to force Geffert to make specific calculations involving different numerical figures. The trial court explained its decision to limit this type of cross-examination as follows:

> Okay, and finally . . . there was another side bar with regard to Mr. Geffert and I believe there was a

request — I don't recall the specific question but the issue that we took up at side bar was whether he could — he could be asked for his opinion using different figures and I think we decided that — I decided that Mr. Kelly could go through his methodology as to how he arrived at those figures but he couldn't be asked to make brand new calculations so that he had the opportunity to cross examine him on his — on the actual figures he used and how he reached then [sic] and perhaps how his figures would differ depending on using a different discount rate but you couldn't ask him to sit down with his calculator and actually come up — in other words, you couldn't use him as a defense witness to come up with some specific new figure to question his economic views; and I think that's exactly what happened.

We conclude that the trial court's limitation of Geffert's cross-examination does not constitute an erroneous exercise of discretion. The trial court clearly considered the relevant facts and utilized a rational process of reasoning in reaching its result. There can be little dispute that defense counsel was given broad leeway in cross-examining Geffert. He simply was not allowed to use Geffert as a defense expert. Had defense counsel desired to present to the jury a different calculation regarding present value of future medical expenses, it was certainly within his prerogative to call his own economist.

*C. Award for Past and Future Pain, Suffering and Disability*

The jury awarded Mrs. Steinberg $1 million for past pain, suffering and disability and $2 million for

future pain, suffering and disability. The defendants claim that the $3 million total award for past and future pain, suffering and disability was so excessive that it must have resulted from passion or prejudice. The defendants also argue that one of Mrs. Steinberg's expert witnesses concerning her future pain and suffering, Dr. Thomas Hammeke, was not competent to testify about future pain and suffering because he is a clinical psychologist, not a medical doctor.

The defendants' argument that the award for past pain, suffering and disability was a product of passion or prejudice is essentially nonexistent. We decline the invitation to serve as advocate for the defendants and choose not to address the conclusory assertion that the award was based on passion or prejudice. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633, 642 (Ct. App. 1992) (where briefing of an issue is inadequate we refuse to address it). We note, however, that the record contains credible evidence to support the amount of the award for past and future pain, suffering and disability.

In regard to the allegation that Dr. Hammeke was incompetent to testify as to the future pain, suffering and disability award, we are not persuaded. While no Wisconsin court has squarely addressed the issue, we conclude that Dr. Hammeke was qualified to provide testimony on this issue.

In *Diemel v. Weirich*, 264 Wis. 265, 268, 58 N.W.2d 651, 652 (1953), the supreme court adopted the following rule as to future pain, suffering and disability:

> ". . . where the injury is subjective in character and of such nature that a layman can not with reasonable certainty know whether or not there will be future pain and suffering, the courts generally require the introduction of competent expert opin-

ion testimony bearing upon the permanency of such injury or the likelihood that the injured person will endure future pain and suffering before allowing recovery therefor."[16]

Dr. Hammeke testified that he is a board certified clinical neuropsychologist. He explained that a clinical neuropsychologist is a psychologist who is also trained in understanding behavior that changes with brain damage. Consequently, he testified that he has had extensive training in understanding brain functions such as memory, attention, concentration, language skills and eye motions. He noted that almost all of his work is with patients who have either some type of suspected or documented brain disease or trauma. In his capacity as the Co-Director of the Neuropsychology Section at the Medical College of Wisconsin, Dr. Hammeke has contact with roughly five hundred brain-damaged patients a year.

Dr. Hammeke personally observed and evaluated Mrs. Steinberg in her home. He concluded that Mrs. Steinberg has a diffuse brain injury affecting the areas of her brain deep within the limbic system. This, according to Dr. Hammeke, has resulted in complete inability to communicate, vision problems, inability to control emotions and inability to complete any activity of daily living independently. He opined that although

---

[16] To reach the issue of whether Dr. Hammeke is competent as an expert to testify in respect to the future pain and suffering of Mrs. Steinberg we assume, without deciding, that the injuries at issue are subjective in nature. It is likely that many of the injuries in this regard are actually objective, i.e., demonstrated by physical examination or x-ray, *Hoeft v. Milwaukee & Suburban Transport Corp.*, 42 Wis. 2d 699, 713, 168 N.W.2d 134, 141 (1969), but at this point we give the defendants the benefit of the assumption.

severely brain damaged, some of Mrs. Steinberg's memories have been preserved. She recognizes her husband Ralph, as well as other family members, and becomes extremely agitated when Ralph is not present. Dr. Hammeke further stated that it was his belief, to a reasonable degree of medical probability, that Mrs. Steinberg has the ability to feel pain and experience fear. He explained that these experiences most likely occur on a regular basis and manifest themselves through abrupt surges and panic attacks.

We are convinced that Dr. Hammeke was qualified to give expert testimony on the future pain and suffering of Mrs. Steinberg. As noted in *Green v. Rosenow*, 63 Wis. 2d 463, 470-71, 217 N.W.2d 388, 392 (1974), " 'the law traditionally has permitted limited testimony of a medical nature by one not licensed as a medical doctor, if he is, in fact, qualified as an expert.' " Here, there is little doubt that Dr. Hammeke is qualified to testify as an expert on injuries of the brain. We conclude that Dr. Hammeke's experience and qualifications rendered him competent to offer testimony as to the neuropsychological issues of Mrs. Steinberg's past and future pain, suffering and disability. This, in concert with the concrete medical testimony that Mrs. Steinberg's injuries were permanent, provides substantial credible evidence to support the jury's award.

### D. Award for Loss of Society and Companionship

The defendants' final assertion is that the $3 million award for Mr. Steinberg's loss of society and companionship of his wife was excessive because it was

the result of prejudice and sympathy on the part of the jury.[17]

Both parties recognize that an individual, in the appropriate circumstances, is legally entitled to recover for the loss of society and companionship of his or her spouse. The defendants argue, however, that the amount of the award in the present case is simply too excessive. We recognize that it is often difficult to precisely quantify this type of damage. However, the fact that the marketplace may not provide an exact value for the broad range of elements that are encompassed in this type of award does not mean that a jury is incapable of determining its value. As noted by the supreme court:

> "The husband's interest in his wife's companionship is not a pecuniary one, nor can any direct evidence as to its value be furnished, and the jury must be left a large discretion in determining the sum to be allowed. . . . loss of the wife's society is a personal and sentimental injury to the husband, and not a commercial one . . . ."

*Ballard v. Lumbermens Mut. Cas. Co.*, 33 Wis. 2d 601, 614, 148 N.W.2d 65, 72 (1967).

The testimony at trial revealed that the Steinbergs had been happily married for forty-one years and had three children. Prior to her injuries, the Steinbergs had enjoyed bowling, dancing and traveling. Mr. Steinberg had retired from his employment shortly before Mrs.

---

[17] The defendants' argument heading also makes reference to the award of $750,000 for the nursing services of Mr. Steinberg. There is, however, no discussion of this issue in the text of the argument. Consequently, we refuse to address the issue. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633, 642 (Ct. App. 1992).

Steinberg was injured. The children of Mrs. Steinberg testified that she was a loving mother who enjoyed spending time with her family. The children noted that their parents had a very close relationship and that they ordinarily did everything together. Simply put, the evidence adduced at trial painted a picture of a loving couple excited about the possibility of sharing their retirement years together. While $3 million may appear relatively high at first blush, there is substantial credible evidence to show that Mr. Steinberg has been deprived of the wife he once had and, therefore, we cannot say that the award is excessive.

## IV. CONCLUSION

We conclude that the violations of the physician-patient privilege as interpreted by the case law, potentially skewered Mrs. Steinberg's right to a fair trial and deserve reconsideration by the trial court. On remand, the trial court must consider each of the violations as set forth above and tailor an appropriate sanction. A new trial on the question of negligence and causation is warranted. During the new trial, Drs. Beroukhim, Wong and Hanna's testimony shall be limited as determined by the trial court. In rendering its decision as to the scope of the doctors testimony, the trial court should be cognizant of the need to deter such future conduct. We further conclude that the award of damages in this case was substantiated with credible evidence.

*By the Court.*—Judgment reversed in part; affirmed in part and cause remanded.